**Robert MOSER, Plaintiff,**

v.

**BRET HARTE UNION HIGH SCHOOL DISTRICT, Defendant.**

**No. CIV–F–99–6273 OWW SM.**

United States District Court,
E.D. California,
Fresno Division.

Jan. 12, 2005.

Maureen Ramona Graves, Irvine, CA, for Plaintiff.

Elaine M. Yama, Lozano Smith, James H. Wilkins, Wilkins Drolshagen and Czeshinski, Fresno, CA, for Defendant.

ORDER RE: SANCTIONS FOR AT-
TORNEY'S VIOLATIONS OF DUTY
OF CANDOR AND NOT TO IM-
PEDE, OBSTRUCT, OR TO VEXA-
TIOUSLY MULTIPLY PROCEED-
INGS

WANGER, District Judge.

## I. *INTRODUCTION*

This matter is before the court on an Order to Show Cause why sanctions should not be imposed against attorneys of record Elaine Yama ("Yama"), the law firm of

Lozano, Smith and their client, Bret Harte Unified School District ("District" or "Defendant"), following their egregious conduct in this appeal from an administrative hearing.

## II. *BACKGROUND*

The Order to Show Cause issued as the culmination of lengthy and contentious proceedings involving an appeal from an administrative hearing by a Bret Harte student, Robert Moser ("Plaintiff"). Plaintiff was a student enrolled at Defendant Bret Harte Union High School District from 1994—1998. Plaintiff alleged that Defendant denied him a free and appropriate public education ("FAPE") under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* *See* Docket ("Doc.") # 1. On October 13, 14, 15 and 16, 1998, and January 19, 20, 21, 22, 25 and 26, 1999, an administrative hearing was heard before William Reyes, Hearing Officer of the California Special Education Hearing Office. Plaintiff appealed the decision of the Hearing Officer on August 27, 1999. Jurisdiction applied under 20 U.S.C. § 1415(e)(2)©) and 28 U.S.C. § 1331. *See id.* at ¶ 2.

In 2001, Trial de Novo briefs were submitted by both parties. Docs. 20, 25, 28, 33, 34, 35 & 41. On August 20, 2001, Defendant filed a motion to dismiss the complaint pursuant to rule 41(b) of the Federal Rules of Civil Procedure for failure to comply with court orders. Doc. 37. Defendant also made numerous evidentiary objections. At the November 19, 2001, hearing on the motion to dismiss, the court informed the parties that if they wished to supplement the administrative record they must make a motion to do so. On November 20, 2001, the motion to dismiss was denied. Doc. 53. At a scheduling conference on December 11, 2001, the court again reminded the parties of the proper procedure for supplementing the administrative record and a schedule was set for motions to supplement the record. A scheduling conference order issued December 12, 2001, which: 1) acknowledged the administrative record was finally complete and accurate; 2) required the record be sequentially paginated and Bates numbered; 3) set dates for the parties to move to supplement the record; 4) ordered each party submit statements of chronological material and relevant facts and statement of disputed facts or objections to the chronological statements of the opposing party; and 5) established the briefing deadlines for cross-motions for summary judgment. *See* Doc. 55.

The June 14, 2002, Amended Scheduling Order called for any motions to further supplement the administrative record to be filed by June 24, 2002. No party filed such a motion, yet Defendant filed a "Further Opposition To Plaintiff's Motion to Supplement Evidentiary Record" on July 8, 2002. At this time the parties were reminded to comply with the Federal Rules of Procedure and were warned that the case had already been unduly extended over three years as a result of the parties' inability to follow court orders or basic rules of Federal Civil Procedure.

Cross-motions for summary judgment, statements of chronological facts, oppositions and reply briefs were filed between June and August, 2002. The evaluation of the matter was significantly delayed due to both parties' repeated incorrect, irrelevant or unsupported citations to the Administrative Record in their Chronological Statements of Facts and Defendant's repeated misstatement of the facts contained in the Administrative Record.

A hearing was held on August 9, 2003. On October 17, 2003, a Memorandum Decision and Order granting Plaintiff's motion for summary judgment and denying De-

fendant's motion for summary judgment was filed. On the same day an Order to Show Cause issued, sua sponte, ordering Ms. Yama, Lozano, Smith and their client, Bret Harte Unified School District to show cause why they should not be sanctioned for misrepresenting facts and law, violating their duty of candor, and willfully and vexatiously multiplying the proceedings, under FRCP Rule 11, 28 U.S.C. § 1927, and the court's inherent power.[1]

Briefs opposing sanctions were filed by Lozano, Smith and Ms. Yama. Briefs supporting sanctions were filed by Plaintiff. The District did not file any separate briefs opposing sanctions despite being ordered to show cause. A hearing was held on January 26, 2004. Ms. Yama, counsel of record, appeared with independent counsel, James Wilkins. Jerome Behrens of Lozano, Smith appeared on behalf of the District and Lozano Smith. Maureen Graves appeared on behalf of the Plaintiff. At the conclusion of the hearing, parties were given additional time to file supplemental papers. Plaintiff was given permission to submit 15 interrogatories to Defendant, Bret Harte Unified School District, in order to enable the court to evaluate the level of the public entity Defendant's participation in counsel's wrongdoing.

### III. *LEGAL STANDARDS*

■ The power of federal judges to impose sanctions for abuses of process is quite broad. *Gas–A–Tron of Ariz. v. Union Oil Co.*, 534 F.2d 1322 (9th Cir.), *cert. denied sub nom. Shell Oil Co. v. Gas–a–Tron of Ariz.*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). The power to sanction derives from several sources: federal statutes (including federal procedural rules), Local Rules of Court, and the District Court's inherent power. Local Rules of the Eastern District Court provide:

> Failure of counsel or of a party to comply with these Rules or with any order of the Court may be grounds for imposition by the Court of any and all sanctions authorized by statute or Rule or within the inherent power of the Court.

L.R. 11–110.

■ The decision to award sanctions is a matter within the court's sound discretion. *See Dahl v. City of Huntington Beach*, 84 F.3d 363, 367 (9th Cir.1996); *Wages v. Internal Revenue Service*, 915 F.2d 1230, 1235 (9th Cir.), *cert. denied*, 498 U.S. 1096, 111 S.Ct. 986, 112 L.Ed.2d 1071 (1991); *Erickson v. Newmar Corp.*, 87 F.3d 298, 303 (9th Cir.1996). "For a sanction to be validly imposed, the conduct in question must be sanctionable under the authority relied on." *Cunningham v. County of Los Angeles*, 879 F.2d 481, 490 (9th Cir.) (Internal quotations omitted), *cert. denied*, 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990).

### A. *Rule 11*

Federal Rule of Civil Procedure 11 ("Rule 11") gives the court authority to issue sanctions against a party whose attorney of record signs a "pleading, written motion, or other paper" is not well grounded in fact, is not warranted by existing law, is not made in good faith, or is brought for any improper purpose. *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1131 (9th Cir.2002). Imposition of sanctions is not limited to attorneys, but may be imposed on parties as well. Rule 11 addresses the problems of frivolous filings and abuse of judicial procedures as a tool for

---

**1.** The Memorandum Decision and Order of October 17, 2003 (Doc. 102) is incorporated by this reference.

harassment. *Stewart v. American International Oil & Gas Co.*, 845 F.2d 196, 201 (9th Cir.1988); *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 830 (9th Cir.1986), *abrogated on other grounds by Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

The Ninth Circuit has stated:

Under the provisions of Rule 11, when an attorney signs a pleading, he [or she] is certifying that he [or she] has read it and that to the best of his [or her] knowledge, information and belief, formed after a reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for an improper purpose. Rule 11 further provides that if the pleading is signed by the attorney in violation of the rule, the court shall impose . . . an appropriate sanction.

*Stewart v. American International Oil & Gas Co.*, 845 F.2d 196 (9th Cir.1988).[2]

Rule 11 creates and imposes on a party or counsel an affirmative duty to investigate the law and facts before filing. *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1508 (9th Cir.1987) and further obliges an attorney to dissuade a client from pursuing specious claims, thereby avoiding possible sanctions by the court, as well as unnecessary costs of litigating a worthless claim. *Mohammed v. Union Carbide Corp.*, 606 F.Supp. 252 (E.D.Mich. 1985).

■■■ Whether to impose sanctions is determined by the reasonableness of inquiry into the law and facts, not the good or bad faith of the signatory. *G.C. & K.B. Investments v. Wilson*, 326 F.3d 1096, 1109

(9th Cir.2003); *cf. Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 932 (7th Cir.1989) ("[A] paper filed in the best of faith, by a lawyer convinced of the justice of his client's cause, is sanctionable if counsel neglected to make 'reasonable inquiry' beforehand."). A pleading, motion or other paper well grounded in fact and law cannot be sanctioned regardless of subjective intent. *Zaldivar, supra.* Conversely, a party is responsible for innocent, good faith mistakes of law or for carelessness of counsel, because reasonably inquiry would reveal a mistake, and counsel who is careless has not made reasonable inquiry. *Lloyd v. Schlag*, 884 F.2d 409, 412 (9th Cir.1989).

■■■ A filing is frivolous under Rule 11 if it is unreasonable when viewed from the perspective of a competent attorney admitted to practice before the district court. *G.C. & K.B. Investments*, 326 F.3d 1096, 1109; *In re Grantham Bros.*, 922 F.2d 1438, 1442 (9th Cir.1991), *Zaldivar*, 780 F.2d at 831. "A district court confronted with solid evidence of a pleading's frivolousness may in circumstances that warrant it infer that it was filed for an improper purpose." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1365 (9th Cir.1990). Sanctions under Rule 11 are not limited to instances in which a pleading as a whole is frivolous, or of a harassing nature. Rather, sanctions may be imposed for improper or unwarranted allegations even though at least one non-frivolous claim has been pled if an attorney has not conducted a "reasonable inquiry" under the circumstances of a case. *Id.* at 1362–65. Monetary sanctions may not be awarded against a represented party for a violation of Rule 11 subdivision (b)(2).

---

2. The mandatory nature of sanctions under Rule 11 ("shall") was changed after this case, under the 1993 amendments to the rule.

[CITE] A court may impose sanctions under the rule for a violation but is no longer required to do so.

**B.** *Local Rules of the Eastern District of California*

In addition to L.R. 11–110 cited above, the Local Court Rules of the Eastern District of California provide:

> In the event any attorney subject to these Rules engages in conduct which may warrant discipline or other sanctions, any Judge ... may initiate proceedings for contempt under 18 U.S.C. § 401 or Fed.R.Crim.P. 42, or may, after reasonable notice and opportunity to show cause to the contrary, take any other appropriate disciplinary action against the attorney. In addition to or in lieu of the foregoing, the Judge ... may refer the matter to the disciplinary body of any Court before which the attorney has been admitted to practice.

L.R. 83–184(a).[3]

Neither the Local Rules nor the Federal Rules provide clear definition of "other appropriate disciplinary action," for attorney conduct that does not warrant criminal contempt. Nonetheless, district judges have an "arsenal of sanctions" they can impose for unethical behavior, *Erickson v. Newmar Corp.,* 87 F.3d at 303, including monetary sanctions, contempt, dismissal and disqualification of counsel. *Id.* The Rules of Professional Conduct and State Bar Rules of California may also be consulted. *See* L.R. 83–180(e) (adopting California Rules of Professional Conduct and decisions of any Court applicable thereto as standards of professional conduct in Eastern District Courts); *see also, e.g., Frazier v. Heebe,* 482 U.S. 641, 645, 107 S.Ct. 2607, 96 L.Ed.2d 557 (1987) (district courts have clear statutory authority to promulgate rules governing the admission and conduct of attorneys who appear before them).

Under ABA Model Rules of Professional Conduct, "[a] lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to a tribunal by the lawyer; (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or (3) offer evidence that the lawyer knows to be false." American Bar Association Model Rules of Professional Conduct, Rule 3.3 (5th Ed.2003). The consequences of violating these rules depend upon whether the violation was intentional and/or systematic:

> 6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.
>
> 6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.
>
> 6.13 Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or doc-

---

**3.** The criminal contempt power under 18 U.S.C. § 401 authorizes punishment by fine or imprisonment, at the court's discretion, for contempt of its authority, and for misbehavior of any person in the court's presence "or so near thereto as to obstruct the administration of justice." Rule 42 punishes as criminal contempt conduct "the judge saw or heard ... or [ ] committed in the actual presence of the court." Fed.R.Crim.P. 42(b).

uments are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

6.14 Admonition is generally appropriate when a lawyer engages in an isolated instance of neglect in determining whether submitted statements or documents are false or in failing to disclose material information upon learning of its falsity, and causes little or no actual or potential injury to a party, or causes little or no adverse or potentially adverse effect on the legal proceeding.

American Bar Association Standards for Imposing Lawyer Sanctions, Standard 6.1 (1992).

Under California law, an attorney may only use methods "as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." Cal. Bus. & Prof.Code § 6068(d). "In presenting a matter to a tribunal, a member: (A) Shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with truth; (B) Shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of face or law; (C) Shall not intentionally misquote to a tribunal the language of a book, statute, or decision; (D) Shall not, knowing its invalidity, cite as authority a decision that has been repealed or declared unconstitutional." California Rules of Professional Conduct, Rule 5–200 (1992).

C. *28 U.S.C. § 1927*

Section 1927, Title 28 United States Code, provides: "Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

 Section 1927 "applies only to unnecessary filings and tactics once a lawsuit has begun." *In re Keegan Management Co. Securities Litig. v. Keegan Management Co.,* 78 F.3d 431, 435 (9th Cir. 1996). For sanctions to apply under 1927, the court must make a determination of recklessness. *See Fink v. Gomez,* 239 F.3d 989 (9th Cir.2001) ("[R]ecklessness suffices for § 1927, but bad faith is required for sanctions under the court's inherent power."); *see also, B.K.B. v. Maui Police Dept.,* 276 F.3d 1091, 1107 (2002). Section 1927:

[o]nly authorizes the taxing of excess costs arising from an attorney's unreasonable and vexatious conduct; it does not authorize imposition of sanctions in excess of costs reasonably incurred because of such conduct.

Similarly, cases that have considered the district court's inherent power to sanction attorneys for litigating in bad faith have related such sanctions to the amount of fees incurred by the opposing party, and have not based sanctions on increased costs experienced by the court.

*Blodgett,* 709 F.2d at 610–11 (citations omitted). Section 1927 sanctions cannot be imposed on a non-attorney. *Zaldivar,* 780 F.2d at p. 831.

D. *Inherent Authority*

 While the district court should issue sanctions under a rule or statute if possible, *Lockary v. Kayfetz,* 974 F.2d 1166, 1170 (9th Cir.1992); it is not so limited and may rely on its inherent powers to sanction misconduct. *Id.; In re Akros Installations, Inc.,* 834 F.2d 1526, 1532 (9th Cir.1987).

■ A sanction imposed under the court's inherent power requires a specific finding of bad faith. *Roadway Express,* 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *Primus Auto. Fin. Services v. Batarse,* 115 F.3d 644, 648 (9th Cir.1997); *Yagman v. Republic Ins.,* 987 F.2d 622, 628 (9th Cir.1993) (In sanctioning counsel, "[c]ourts may not invoke [inherent] powers without a specific finding of bad faith"); *Zambrano v. City of Tustin,* 885 F.2d 1473, 1478 (9th Cir.1989) ("To insure that restraint is properly exercised, we have routinely insisted upon a finding of bad faith before sanctions may be imposed under the court's inherent power.") Bad faith "does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides,* the assertion of a colorable claim will not bar assessment of attorneys' fees." *Mark Ind., Ltd. v. Sea Captain's Choice, Inc.,* 50 F.3d 730, 732 (9th Cir. 1995) (internal quotation marks and citations omitted).

■ Under the court's inherent authority, sanctions may be imposed on an attorney or a party to the suit. *See Roadway Express,* 447 U.S. at 766, 100 S.Ct. 2455.

## IV. ANALYSIS

Lozano, Smith's, Ms. Yama's, and the District's actions in these proceedings have greatly increased the work of Plaintiff's attorney and the Court itself, as well as delayed the just resolution of the case. The objectionable acts fall into four general categories: (1) bad faith, frivolous objections, (2) misstatement and mischaracterization of facts contained in the administrative record, (3) misstatements of

the applicable law, and (4) intentional obstruction of the speedy and just resolution of the dispute. Taken as a whole, they show that Defendant and its counsel made a concerted effort to distort, if not outright deceive, the court when shaping the court's view of both the record and applicable law in the case. By consistently presenting untruths and half-truths, Defendant and its counsel obstructed the fair, just, and expeditious resolution of the proceedings. These actions were undertaken in violation of, and with reckless disregard for counsel's duties to the court. When evaluated as a whole, the actions of counsel and the District amount to bad faith and are sanctionable.

### A. *Examples of Counsel's Actions*

The Order to Show Cause detailed some, *but not all,* of the many frivolous objections and misstatements of fact contained in Defendant's Motion for Summary Judgment briefs.[4] *See* Doc. 101, October 17, 2003, Order to Show Cause for Sanctions. Counsel has acknowledged these errors, but claims they are innocent mistakes or misunderstandings. The District has not responded in any way.

#### 1. *Frivolous Objections*

(1) The District "disputes" Plaintiff's statement that "Robert enrolled at Bret Harte Union High School District for 9th Grade" in August 1994. Defendant refuses to admit this "undisputed fact" because, "Plaintiff fails to cite administrative record."

Regardless of Plaintiff's failure to cite the administrative record, it is *indisputable* that Robert enrolled at Bret Harte for 9th grade.

4. Many of these same misstatements are contained in Defendant's Trial De Novo brief as well. *See* Docket No. 25.

(2) Plaintiff testified that an accommodation made by Ms. Nanik, "actually increased Robert's workload by shifting from multiple choice to writing assignments." UF 96, Doc. 78. Defendant objects to Plaintiff's undisputed fact: "argument and conclusion. Misstates testimony. J. Moser did not testify that Plaintiff's workload was 'shifting from multiple-choice to writing assignments.'"

Defendant's objection is frivolous. Mrs. Moser testified exactly to that effect: Q[Graves]: "when Ms. Nanik decided to have him do something else, other than taking the test at home, did this involve more writing on Robert's part?" A[Mrs. Moser]: "Yes." AR 1882:17–20. A[Moser]: "And then, they wanted to have Robert, instead of taking the test home, to read the whole chapter, which is fine. That's what he did. But then, to answer all of those questions on the back, which was more than just taking a test, you know, 'because you have like an A or B. It's A, B, or C choice. So, it was a lot easier for him to do that. It took a lot more time and energy, which he really didn't have, to be doing numerous questions and answering all that long stuff." AR 1882:4–11.

(3) Defendant's objection to undisputed fact No. 98 once again misstates the obvious. The document speaks for itself. Defendant complains "plaintiff's references to 'long-standing frustration' and 'depression' and 'hired an advocate' are statements not referenced within the document." The document clearly references Robert's frustration and depression as well as Mrs. Moser's frustration. The document does not mention the hiring of an advocate.

The document is a letter sent by Mrs. Moser on June 17, 1997, to Superintendent Wilamek (received June 18, 1997), Ronald Lewis, Jan Edwards, Principal of Bret Harte High School, and the Bret Harte School Board. Mrs. Moser's letter specifically states Robert was depressed and refusing to participate in class due to this depression, and his frustration with his teachers. AR 3335. Mrs. Moser expressed her frustration with the school directly: "as far as I can tell, the teachers and administration have done absolutely nothing they have been asked repeatedly to do, nor have they done anything to help my son." Mrs. Moser concludes:

Just for your information, Robert is not a 'lazy' student, just trying to get out of work. In fact, in spite of his illness, he has gone out of his way to take entry tests in math and English for Columbie College, and, *he has passed both.* He is going for surgery Thursday and even though he should be laid up for 14 days (not to mention 8 weeks of not being able to move his torso), he is still taking classes.

To say I am disgusted with the treatment we have received is definitely an understatement. We had to change schools, move our home, and have had continuous conflict with teachers and administration [sic] who are not willing to go a little out of their way to help a student who is truly ill! Why weren't we told from the beginning that, because of Robert's illness, he had a right to be transported to school? Why weren't we told about the '504' plan? Why are the teachers and administration now so difficult and unwilling to cooperate?

I am asking [for] your help. My son and family have been through enough. Please intervene and give my son the help he needs and is entitled to his last two years of high school. If we do not receive a satisfactory response and solution by June 30, I will file a complaint with the O.C.R. [Office of Civil Rights] and the appropriate State Department.

AR 3334–3336; 3337–3339.

(4) A diagnosis of chronic fatigue syndrome and depression is written on a doc-

tor's note dated 9/12/97. Plaintiff contends this note was forwarded to the District. UF 97a, Doc. 78. Defendant objects to whether or not this diagnosis was actually forwarded to the school: "argument and conclusion. Misstates evidence. Fails to cite record." *Id.*

Defendant makes no statement as to whether or not the District actually received the doctor's note.

Defendant's objection is inexplicable. The 504 accommodation plan states *explicitly,* "Robert will meet with Mrs. Haskell weekly on Fridays from 10:00 to 10:30 a.m. They will confer on his progress, and discuss any academic difficulties he may be having."

(5) Defendant objects to Plaintiff's undisputed fact # 15, which states: "In eighth grade, without an assessment or IEP, it was noted on a parent conference report that Robert would receive 'special ed assistance from 1:15–2:00 in Ms. Johnson's room.'" (Page 3783). Defendant's objection, "Misstates evidence. Page 4368 IEP dated 1/13/93 specifically states that 'although student does not qualify for special education services, he will participate in after school study hall three times a week for homework.'"

Defendant's objection is *unintelligible* in context and meritless. The cited form in Plaintiff's undisputed fact, AR 3783, states exactly what Plaintiff contends it states: "Vallecito Union School District Parent Conference Report" dated 12/93 states "4. Special ed assistance from 1:15–2:00 in Ms. Johnson's room." The form was completed *prior* to the Triennial IEP review where Robert was exited from special education. The IEP form cited by Defendant, *dated one month later,* on 1/13/93, "Formal tests do not suggest the presence of a processing disorder; does not qualify for special education; Robert will participate

in after school study hall 3x/wk for homework."

The objection obstructs the court's undisputed fact finding process.

(6) Defendant objects to Plaintiff's undisputed fact # 16, "Robert saw a physician who diagnosed chronic fatigue syndrome." (Page 4259). Defendant's objection: "Disputed. Page 4259 is a doctor's notes [sic] which is signed by the doctor on 6–21–95." Also, see Plaintiff's Fact No. 58, which references page 3383 (the same document as 4259), and indicates the appropriate date of 6–21–95.

Defendant's objection is confusing at best, misleading at worst. The documents cited (AR 4259 and AR 3383) *both* have 8/5/95 as the date "was seen at this office on" and the diagnosis "Chronic Fatigue Syndrome." Under "other" it states, "unable to participate in PE from '95 through '96." The document is signed by the physician, Dr. Lake, on 6/21/95. Plaintiff's Undisputed fact lists 8/94 as the date Robert saw the physician, who diagnosed CFS. Both copies of the document support this statement. The fact that the doctor signed the note in June of 1995, to provide an excuse from P.E. has nothing to do with the fact that Robert was seen in August of 1994 and diagnosed with Chronic Fatigue Syndrome at that time, as indicated on both copies of the doctor's note. Defendant's objection to the fact as "disputed" is obstructive, the document speaks for itself; Defendant's reference to when the note was cited is a red herring.

(7) The District "disputes" Plaintiff's statement of undisputed fact # 21, Doc. 78, that "an assessment was conducted" on 9/10/94. Defendant refuses to admit this "undisputed fact" because, "Plaintiff fails to cite administrative record."

It was unnecessary for Plaintiff to cite the administrative record because it is *indisputable* that an assessment was conducted in Sept–Oct of 1994 and that fact was best known to the District. This is a bad faith, unjustified objection.

(8) Defendant objects to part of Plaintiff's undisputed fact # 27 which states: "9–10–94 The 'concentration, attention span, memory problems of a diverse kind' and diffuse processing problems common in narcolepsy were not explored." (Page 745/line 7—page 1746/line 21). Defendant's objection: "argument and conclusion: misstates testimony of Dr. Patterson, in which there is no reference to 'The concentration, . . . were not explored.'"

Again, Defendant's objection is totally without basis. The cited testimony explicitly includes the sentence referenced by Defendant:

Graves: I want to um, I'm not sure whether you said what you meant, so I want to make sure that whether, what you meant. I think you said people with narcolepsy often have problems with memory and difficulties and things [unintelligible]. My question was about head injury -

Dr. Patterson:—yeah -

Graves:—is that what you are talking about -

Patterson:—and head injuries have the same characteristics. But I was about to say, and in Robert's case, uh, he was noted in, in an early assessment as having a visual memory problem. And um, they really didn't do a lot of definitive testing from memory in, in any of the assessments. But it, it is not unusual in kids with head injuries to find, attention-span difficulties, concentration difficulties, uh, memory types of difficulties. And those are not memory difficulties that are necessarily showing up on Wechsler Scales. In other words,

you need definitive tests for that, sometimes what are called neuropsychological tests . . . but no visual testing for visual memory per se is, was, was done. No -

Graves:—[unintelligible] California Learning Test is an auditory memory?

Patterson: Yeah, auditory memory, yes that's correct. And so, in, in this particular case, that would be consistent with brain injury and we've never had a neuro-psych battery administered and we've never even had a neuro-psych screen administered, so we don't really know but that's not a typical independence of the narcolepsy. *But many of the same things are found in narcoleptics; concentration, attention span, memory problems of a diverse kind and sometimes there's this deffuse [sic] problem where they have processing problems but it's hard to put a definitive label on what it is.* It's a deffuse [sic] neuro-cognitive or neuro-developmental delay.

(9) Defendant objects to Plaintiff's undisputed fact # 30 which states: "10/25/97 doctor care e-mails, the special education director, testified that 'it's very difficult to tell' from this document whether Robert was being found eligible for special education (page 48/line 14—page 51/210)." Defendant's objection: Misstates testimony as cited. K. Mill's testimony states: 'it looks like he does not [qualify] because he's going to participate in a regular program on a full-time basis.' *See* K. Mills' testimony, page 48:20–21: 'I don't see that he's determined eligible on this document.' *See* K. Mills' testimony, page 49:1–17; 'it doesn't discuss discrepancy . . . it seems to infer that its lower than expected. But it doesn't indicate a discrepancy.' *See* K. Mills' testimony, page 50:3–9[.]

Defendant's objection is frivolous. The first two lines of the cited testimony, AR 48:14–16, explicitly state:

Graves: Okay. Is it your understanding in this IEP meeting Robert was found eligible or ineligible for Special Education services?

*Mills: It's very difficult to tell.*

(10) In Defendant's objection to Plaintiff's undisputed fact # 31, Defendant restates the untrue statement that "Robert had not yet been diagnosed."

The citation provided by Plaintiff as his proposed undisputed fact # 31 objected to by Defendant is AR 4273, *Defendant's* IEP report, dated 10/25/94, which states, "Dr. says he now has chronic fatigue syndrome." *See* additional discussion regarding Ingrid Olson Miller's testimony that she had the diagnosis as of the IEP meeting again via her conversation with Robert's doctor in November '94, *supra,* at p. 11(N.). The same can be said for Defendant's frivolous objections to Plaintiff's undisputed facts # 32 and # 33.

These objections deterred the finding of genuinely undisputed facts.

(11) Defendant objects to Plaintiff's undisputed fact # 38, which states, "10/25/94 Robert's mother was understandably confused by the October 1994 process, seeing Robert as 'semi-qualified,' but not 'quite,' and thinking the plan was to 'see what happened.' (Page 1865/line 17–27)." Defendant's objection: "argument and conclusion. Misstates testimony of J. Moser."

Defendant's objection is frivolous. Mrs. Moser's testimony says exactly what is quoted and cited:

Moser: Uh, yeah, they did, they tested him and uh, he semi-qualified, he kind of qualified, but they didn't think he, they didn't think he quite qualified. I'm not really sure, other than that I wanted to get whatever service, like he had back when, uh, in Oak Grove, ... so, I wanted some kind of service like that, but they said he really didn't quali-

fy, so, we just had the [sic], see what happened.

(12) Bret Harte "disputes" Plaintiff's statement that "Robert was a regular education student at Arnold High School, a very small and remotely located high school, which featured behaviorally challenged students and no special education staff."

Defendant refuses to admit this "undisputed fact" because, "Plaintiff fails to cite administrative record."

Regardless of Plaintiff's failure to cite the administrative record, it is *indisputable* that Robert enrolled at Arnold High School his second semester and that Arnold was a "continuation" type high school for troubled students and had no special education staff.

The above 13 citations are only a few examples of Defendant's and its attorneys' frivolous, vexatious, and obstructive objections to Plaintiff's statement of undisputed facts. Defendant and its attorneys continued to make similar frivolous objections throughout their "amended response and opposition to Plaintiff's chronological statement of facts." Doc. 78. The overall effect of Defendant's and counsel's conduct was to impede and meritlessly increase the work of the Court in the truth ascertainment process.

2. *Misstatement and Mischaracterization of Facts Contained in the Administrative Record*

(1) Defendant contends "Mrs. Moser only wanted transportation, tracking of progress and some counseling." UF 48 & 50, Doc. 72. Defendant contends that "At no time did Mrs. Moser indicate to Mr. Smith that she wanted more accommodations." UF 57, Doc. 72.

Mr. Smith's testimony contradicts Defendant's claim.[5] Mr. Smith testified he believed the accommodations were sufficient, but, in answer to a question, acknowledged that he knew Mrs. Moser would not "feel that [Robert] was getting . . . enough accommodations." AR 1458:9–19.

(2) Defendant alleges Ms. Pape–Reynoso, Plaintiff's sophomore learning director, "communicated with Plaintiff's teachers about his special physical health needs and the accommodations required as to assignments." UF 53, Doc. 72.

Ms. Pape–Reynoso's testimony contradicts Defendant's claim:

Q: About how often would you say you . . . spent working with him [Robert] through the course of the year?

A: I didn't see Robert very often. Typically, it was a phone call from home requesting work because he was out and it was coordinating with teachers.

AR 917: 16–22.

Q: Do you recall being . . . given anything to read about Chronic Fatigue Syndrome?

A: At the . . . student study team meeting, Sheila Silcox did . . . share information . . . and there was certainly a long discussion . . . in terms of how that would play out. And, and what kind of support he would need.

Q: . . . *And, was anyone going to come out of that meeting and share this information with Robert's regular education teachers to your knowledge?*

A: *Someone probably was, I can't tell you who that person was. It wasn't me.*

Q: Did teachers talk to you about the Chronic Fatigue Syndrome diagnosis during Robert's sophomore year?

A: Usually the contact had more to do with, 'where is he?' 'Here's the work for him.' 'Mom said she was coming to get the work.' 'She didn't come.' 'Where is it?' and those kinds of things. AR 920:8–26, 921:1–4.

(3) Defendant alleges the school counselor, Mr. Smith, met with Robert "more than a couple of times a month." Doc. 72 ¶ 54 at 16.

Mr. Smith's testimony shows this is a misrepresentation. Mr. Smith ultimately testified that he met with Robert several times, "probably *not* more than—umm—a couple of times a month." AR 1450:14–15; Doc. 72 ¶ 54 at 16. Mr. Smith testified that Robert "would never initiate" a meeting and that Mr. Smith himself initiated meetings with Robert "a couple times a semester. But I can't remember exactly." AR 1450:14–26; Doc. 72 ¶ 54 at 16.[6]

(4) According to Defendant, "Mr. Smith, the school counselor, and the learning director, Saundra Wimberly, tracked Plaintiff's progress [in 11th grade] . . . Wimberly testified that Plaintiff would have been able to get an 'A' if all his 'modified assignments' had been turned in and judged on their own merit." Doc. 72 ¶¶ 71–72 at 20 (disputed) citing Wimberly, AR 133:11–24; Smith AR 1427:18–21; Evaluation Reports, AR 4205–4209.

These assertions are contradicted by the record. Learning Director Wimberly testified that her first contact with Robert was at the *end* of 11th grade, in May–June, when she mailed out an academic

**5.** Mr. Smith is a school counselor for Defendant.

**6.** This blatant misstatement first appeared in Defendant's Trial De Novo Brief and was specifically pointed out to Defendant by Plaintiff in his Reply Brief. *See* Doc. 25 and 28. Ms. Yama's explanation that this was merely a "mistake," repeated after having it specifically pointed out to her, is untenable.

probation letter. AR 133:12–26. Ms. Wimberly testified she had no knowledge at that time about Robert's CFS or why Robert failed two classes and that she "probably" had no further contact with Robert "until the following year." AR 134:4–135:2.

Regarding grading, Ms. Wimberly's testimony is cited incompletely which creates a false impression. Her complete testimony shows she really did not know how Robert was graded:

A: ... and my understanding was that if Robert ... was assigned an essay, for example, at the time, you know, there were no time constraints on it as to due date, then it would be judged on its own merit and would be possible to earn an A on that assignment and because he was doing lesser work than the other students, my understanding was that he would still be able to earn an A based on the number of assignments that he completed and the quality of the assignments.

Q: Do you recall any explicit discussions of this question of how the grading will work before yesterday?

A: No, I don't. What I remember is that ... though it was never expressed directly, that the quality of the work is what counted.

Q: Do you recall ... do you know whether in the final calculation of grades in each class, were teachers looking at what percentage of the general assignments Robert had completed, or were they looking at what percentage of his assignments he completed, or do you know?

A: In some cases, I don't know. In some cases, I do. ...

AR 393:3–25, 394:1–2.

Q: And what about the other teachers? Do you know how they were handling the situation?

A: *The best that I can tell you is that I know that they eliminated assignments, so I made the assumption that they were grading only on the material that he was assigned.*

Mr. Smith's testimony does not support Defendant's contention that Mr. Smith "tracked Plaintiff's progress" during Robert's 11th grade year:

A: 97/98 [Robert's 12th grade] I would have been off completely, 96/97 [Robert's 11th grade] I was on partial ... time—I think it was 50 percent ... I was only her a certain number of hours a week and I was working mornings ... and I was seeing only a small percentage of the typical load that I had.

Q: And the year before that [Robert's 10th grade, 1996/1997], were you also on some kind of [unintelligible]?

AR 1427:2–17.

The cite given by Defendant's attorneys to support Defendant's contention that Mr. Smith tracked Robert's progress during his 11th grade year, *actually discusses Robert's 10th grade year:*

Q: And from 1994 until the end of the 1997 spring semester, did you have the same position throughout that time?

A: [ ] as far as my counseling responsibilities, pretty much. [ ] Full-time counseling and, [ ], I had some administrative responsibilities (unintelligible) extra duty things and nighttime things, and all the things that we get to do that are so much fun. [ ] To help manage lively, young people.

AR 1427:18–24.

(5) The district argues "Section 504 accommodations were provided to Plaintiff [prior to 12th grade]. Although they were written down and implemented for the past several years, they were not ever

written on a formal 504 Service Plan." UF 102, Doc. 72.

The District's argument *is directly contradicted by* the evidence it cites in the record; Superintendent Wilamek did not testify that accommodations were "written down and implemented for several years." Superintendent Wilamek testified:

[I]t was my understanding at the time I wrote this letter, that some accommodations had been made for him. I wasn't sure whether a complete 504 plan had been written since the person who was employed in the district was on leave of absence from the district, so I don't know what had taken place, and I couldn't find a formalized 504 plan, because usually there's a copy of them in my office. So I didn't find one.... I knew that we made accommodations as far as graduation requirements and transportation, but I didn't know what else had been done except that I do recall having a conversation with a counselor asking to make sure that accommodations were made in the classroom, etc .... but since I couldn't find [a 504 plan], I decided we're going to do it again and do it by the book.

AR 308:1–18.

(6) Defendant states Plaintiff's English teacher, Vicki Oneto, "provided many accommodations, including ... *tape recording of answers* ...." Doc. 72, UF 136. Ms. Oneto testified:

Q [Stephens]: What kind of adjustments did you make?

A [Oneto]: ... *One time* he made a tape recording of [ ] identifications.

(7) Defendant contends "the IEP team met to discuss Plaintiff's individual transition plan." Doc. 72, UF 145 citing ITP plan, AR 4031–4035.

The IEP team and the ITP meeting participants were different. The ITP meeting did not include Dr. Trotter (school psychologist), Deborah Wright (Robert's advocate), any regular education teacher, nor any administrator. The ITP form shows the following five people in attendance (via their signatures): Robert Moser, Patty Haskell (resource specialist); Glenda Kinnear (Vocational Tech), Mrs. Moser, and Sandra Wimberly (Learning Director). AR 4033; AR 2933. By comparison, the October 6, 1997, IEP team meeting included: Mrs. Moser, Dr. Trotter (School Psychologist), Mr. Wilamek (Administrator/Superintendent), Mr. Randall (Regular Education Teacher), Dr. Mills (District Director of Special Ed.), Ms. Haskell (Resource Specialist), Ms. Wimberly (learning Director) and Ms. Wright (Robert's Advocate). AR 4084. The IEP team did not meet to discuss Robert's transition plan. The October 6 IEP form puts off discussion of Robert's transition until two months later. *See* AR 4083.

(8) Defendant contends Glenda Kinnea, Vocational Technician, "met with Plaintiff one hour to 45 minutes one time per week to discuss his interests, refer to department of rehabilitation, and obtain work experience." Doc. 72 UF 147 citing Kinnear AR 600:23–27; 601:1–6; 604:14; 605:23–27; 606:1–6; 608:1–10.

Defendant misrepresents its own witnesses' testimony:

Q [Graves]: Can you describe your involvement with Robert Moser?

A [Kinnear]: I didn't have a lot of involvement with Robert. I was brought into an IEP meeting for him and, I think, it was January. I'd have to check my records.... I spent, I would say *from January of 1997 until he graduated maybe a total of [ ] an hour and 45 minutes with him*. And that includes what's called an intake meeting with the department of reha-

bilitation counselor and an exit meeting with the department of rehabilitation counselor.

AR 600:23–27, 601:1–3 (emphasis added).

(9) Defendant asserts that "on January 13, 1998, the IEP team met to add two periods a day to Plaintiff's schedule for study skills to help with assignments." Doc. 72 UF 159 (disputed).

There is no record of a January 1998 IEP team meeting to address Robert's schedule. The IEP addendum, AR 4001, is dated 1/13/98. The IEP addendum form states, "Considered a part of the IEP written on '10/6/97.' " AR 4001 (10/6/97 is filled in). The following changes are described on the form, "add two periods a day, 48 minutes a period, five days a week for study skills to Robert's schedule. This change will begin at semester 10/98. Continue with goals from the IEP 10/6/97." AR 4001. The addendum is signed by Mrs. Moser. Ms. Wimberly (listed as "administrator") signed the addendum on 1/16/98. Ms. Haskell signed the addendum on 1/13/98. Ms. Oneto signed the addendum and did not include a date. *See* AR 4001. Three school officials signed this form, not the entire IEP team. The IEP team which met May 28, 1998, consisted of: Mrs. Moser, Robert Moser, Superintendent Wilamek, Mr. Randall (math teacher), Ms. Haskell (Resource Specialist), Scott Black (Department of Rehabilitation), Nancy Stephens (District's Attorney), Ms. Wimberly (Learning Director), Ms. Graves (Plaintiff's attorney), Sonya Bach (nurse), and Dr. Mills (District's Special Education Director). Mrs. Moser testified that the schedule change did not occur through an IEP meeting, instead she "met with Patti [Haskell] in . . . the classroom." AR 1910:6–12. Ms. Haskell's handwritten notes indicate that the schedule change was made unilaterally: "mom asked about an hr a week. I said the IEP

was 30 minutes a week and we would change that to 1 hr a day [.] [illegible] mom about addendum to change to 48 minutes a day five × a week[, mom] wants update on classes. Sent home addendum for signature." AR 3998.

(10) An IEP "exit meeting" was convened on May 28, 1998. Doc. 72 UF 175. Defendant claims the IEP team determined Plaintiff had met all IEP goals and objectives. Doc. 72 UF 175.

Page three (of five) of the 5/28/98 "exit" IEP report contains a copy of the 10/6/97 IEP plan "goals and objectives." Handwritten notes, completed by Patty Haskell, *show Robert had not met 3 of the 5 objectives listed under the "study skills" goal section.* AR 3834. However, the very next page (# 4 of 5 in 5/28/98 IEP report), a blank version of the 10/6/97 "goals and objectives" page has the sentence "district believes goals and objectives have been met" scrawled across the page. AR 3835. At best, Defendant misstates the record by only including one of two contradictory sections of the exit IEP report.

(11) Defendant alleges Plaintiff provided a diagnosis of narcolepsy "after graduation." Doc. 72 at ¶ 186.

The District had notice of the narcolepsy diagnosis on May 28, 1998, as noted on the IEP "health update" dated May 28, 1998. AR 2779: "Health concerns: narcolepsy, recently diagnosed—to be confirmed;" signed by school nurse Sonia Bach.

(12) Defendant's Undisputed Fact # 7 states, "On April 19, 1989, an IEP team determined Plaintiff was eligible for special education services by a resource specialist *for 1 hour per week* through the 5th grade." (Emphasis added). IEP pp. 4395–4397; IEP May 1991, pp. 4387–4394.

The IEP at AR 4394 specifically states Robert is to see the resource specialist "up to 60 min daily," not once per week.

(13) Defendant's Undisputed Fact # 8 states, "In 6th grade, Plaintiff's services were reduced to 45 minutes" citing IEP, May 1992, pp. 4379–4381.

AR 4379 states RSP (Resource Services) beginning May 28, 1992, ending January 1993 "one 45 min session 5x each week in written language."

(14) Defendant's Undisputed Fact # 29 states, "During this IEP meeting, Mrs. Moser stated that Plaintiff's physician was considering a diagnoses of chronic fatigue syndrome. Nurse was to communicate with doctor regarding physical condition," citing IEP 10/25/94, 4273; Olsen–Miller 737:17–25; 738:9–11; Harrison 1293:12–13; Sylcox 854:15–17; Olsen–Miller Notes, 3825–3826. The gist of this assertion was that no diagnosis of chronic fatigue syndrome had been made as of the October 1994 IEP meeting.

Defendant's own 1994 IEP report, written evidence and hearing testimony contradict its claim. The IEP states: "Robert has a history of mono—Dr. Says he now has Chronic Fatigue Syndrome—nurse will communicate [with] Dr. re: his physical condition." AR 4273. Nurse Silcox testified that, *at the October 1994 IEP meeting she believed Robert had been diagnosed with CFS and was eligible for special education.* AR 854:15–855:14. Nurse Silcox wrote a letter to Robert's doctor, Dr. Lake, on November 1, 1994, which states:

I am writing you on behalf of Robert's teachers who continue to be concerned about Robert's apparent tiredness and continued lack of interest in any activity—physical or mental.

I was concerned that he [Robert] might be depressed until I talked with his mother and she explained that he had mononucleosis and is now diagnosed with Chronic Fatigue Syndrome.

Would you please send us more information on this diagnosis and prognosis. . . .

If you would rather call than write me please do. Thank you for your help. AR 4270.

According to Nurse Silcox, she understood Robert to have CFS at the *beginning* of his freshman year:

Q: And when he [Dr. Lake] called, do you recollect specifically that he said Chronic Fatigue Syndrome or did he say they were doing further testing?

A: *He said Chronic Fatigue Syndrome.*

Questions by Defendant's attorney, Ms. Stephens, AR 872:21–24.

Q: At this point, was he [Dr. Lake] finished with his testing or was he, was the diagnosis still in progress?

A: *As far as I knew, the diagnosis was inclusive. That he [Dr. Lake] had decided that was his diagnosis.*

Questions by Defendant's Attorney, Ms. Stephens, AR 873:22–27. Plaintiff's attorney, Mrs. Graves, elicited the same response:

Q: So, when you were speaking with him [Dr. Lake], were you, under the impression that Robert did have Chronic Fatigue Syndrome:

A: Yes.

AR 880:2–4. Nurse Silcox considered her November, 1994 telephone conversation with Dr. Lake sufficient documentation of the diagnosis:

Q: In your letter, do you ask him [Dr. Lake] for a written diagnosis or did you tell him that a phone call would be fine as well?

A: I have found that doctors sometimes felt that [the phone] was much more expedient and with documenting what he said over the phone, I felt that was sufficient. . . .

Q: And, did you push him to put something in writing at that point?

A: No.

AR 880:5–22.

Plaintiff points out that in Defendant's June 21, 2001, Brief at p. 4:22–24 addressing whether Plaintiff's CFS was being "considered" or was actually diagnosed, in a Further Brief dated August 20, 2001, the word "inclusive" was changed to "inconclusive," which misrepresented the status of the CFS diagnosis.

(15) Defendant's undisputed fact # 31 states, "Subsequent to IEP meeting, Nurse Silcox contacted Dr. Lake regarding Plaintiff's medical condition and information on diagnoses or prognoses concerning chronic fatigue syndrome." In addition, Nurse Silcox discussed with family regarding vitamin supplements. Ms. Moser indicated she was not interested in vitamin therapy. Defendant's Undisputed Fact # 32 states, "In November 1994, Nurse Silcox spoke with Mr. Lake who indicated that he was running a few more lab tests on Plaintiff to make sure he was not anemic. Dr. Lake also indicated that testing of Plaintiff for mononucleosis was not conclusive and that he was continuing testing and the diagnosis was still in progress. They also discussed vitamin therapy." Letter, p. 3393; Silcox 874:1–12. Defendant's undisputed fact # 34 states, "district going to provide whatever supports possible until Mom got diagnosis." Defendant's undisputed fact # 35 states, "staff was provided information regarding chronic fatigue syndrome." Doc. 72.

The statements taken together show Defendant was attempting to misleadingly imply that the CFS diagnosis was still in progress. The letter and Nurse Silcox's testimony were about the mononucleosis diagnosis, not the CFS diagnosis. The letter cited at AR 3393 is a letter from Nurse Silcox dated November 10, 1994, to Mrs. Moser, which states, *in its entirety:*

Dear Mrs. Moser: Dr. Lake called and told me he will be running a few more lab tests on Robert to make sure that he is not anemic and that his organs are working properly. He feels that retesting later for mononucleosis is not conclusive as once this test results show positive, which they will once he has had mono, they will always show a positive result. In this case a positive result is not always conclusive or active disease.

I asked Dr. Lake about vitamin supplements for Robert, explaining that you stated he was not a very good eater. He said that a multivitamin tablet without iron would be a good idea for Robert. He stated that he had never heard of the body not producing its own vitamins after having taken a vitamin pill. Please discuss the vitamin issue with Dr. Lake if you continue to have questions regarding their use.

Please call me if I can be of further assistance.

Nurse Silcox's cited testimony at 874:1–12 is solely about the mononucleosis diagnosis, not the CFS diagnosis.

(16) Defendant's undisputed fact # 30, listed under 9th grade (1994–1995) states, In response to parents' concern regarding chronic fatigue syndrome, District staff offered accommodations, including shorter day, no P.E. or electives, transportation, and classes in personal development and study skills taught by special education resource specialist, Ms. Olsen–Miller, in order to monitor Plaintiff's progress and provide assistance with written expression. The personal development class and the study skills class provided by resource specialist who would serve both special education students and "at-risk" regular education students. Olsen–Miller 746:22–26; 748:3–5; 759:1–2; 781:4–8; Silcox

863:5–12; Harrison 1288:4–27; Olsen–Miller 759:1–2; 775:22–24; Silcox 881:12–18; Harrison 1355:1–4; Olsen–Miller Notes 3825–3826.

The record contradicts most of Defendant's claims. Robert was not offered a shortened day until his second semester when he transferred to a small continuation-type high school in Arnold, closer to home. AR 291; 4262. Robert was not provided transportation until his *sophomore* year, *after* his mother specifically requested transportation services, when she *learned from a neighbor* that Robert had the right to the accommodation. AR 4253; Doc. 72, ¶ 48 at 13. The school placed Robert in a resource specialist's class held in the early morning, at a time Robert's CFS made it difficult for him to attend. The school was aware of Robert's CFS and its effect upon his ability to attend morning classes. *See, e.g.,* Ingrid–Olsen testimony, AR 750:13. *Robert was not exempted from P.E. until his sophomore year.* AR 4226; 867. At Arnold, Robert was required to keep a P.E. log of activity, *the same requirement of every student at Arnold.* AR 4262. Plaintiff points out, and the record confirms, that Robert did not receive any special written language instruction from Ingrid Olsen–Miller:

> Q: Did you—you focused your efforts with him on written language?
>
> A: Most of the time it was just progressive works caught up [sic]. He was so overwhelmed at times. And most of it was in a written form. So, there was assistance with that, as well as getting caught up.
>
> Q: Did you have time to deal with the spelling concerns particularly the mother had had?
>
> A: (unintelligible) Sometimes Robert wasn't always happy with my hovering over his shoulders, typical teenager. (Laughter) Sometimes he wanted to be left alone, but I attempted to assist whenever I could.

AR 749:4–13.

(17) At the end of his first semester of 9th grade Plaintiff's mother transferred her son from the District High School to Arnold High School without alerting Bret Harte High School staff or discussing her decision with anyone. Smith, 1444:10–19.

The cited testimony does not support this claim:

> Graves: Do you recall finding out at any point why, uh, Robert had transferred to Arnold High School?
>
> Smith: No.
>
> Graves: Do you recall finding out at any point how they got him in?
>
> Smith: Pardon me?
>
> Graves: Do you recall ever—at any point receiving anything about how things had gone for Robert at Arnold High School?
>
> Smith: Not until he was getting ready to come back to Bret Harte.
>
> Graves: And then what did you hear?
>
> Smith: Um, that he was coming back.

The claim is a direct falsehood. Testimony from Ingrid Olsen–Miller indicates she and Mr. Smith were both aware of Robert's transfer sometime in November or early December:

> I. Olsen–Miller: Well, he responded and I don't remember if I spoke to him initially in about the middle of November, or the end of November, or the first couple of days in December, but sometime in there I approached him for the first time and it—at that time he informed me that it looked like Robert

would be attending Arnold High the second semester at parents request.

AR 745:1–6.

(18) Defendant's undisputed fact # 44 states: "Plaintiff missed 16 days in the 9th grade year, which was 'real good' for Plaintiff." Wilamek 373:18–22.

Mr. Wilamek's testimony, AR 373:14–22, states Robert was absent for 16 days *during his second semester* of 9th grade, at Arnold High School:

> Wilamek: *This is the attendance from Arnold High School.*
>
> Stephens: OK. You can see it's obviously been sanitized and only Robert Moser's name is left on there.
>
> Wilamek: Um hum.
>
> Stephens: What was his attendance? How would you characterize his attendance in the ninth grade?
>
> Wilamek: Real good. I mean, *he was there a semester and he missed 16 days.*
>
> Stephens: OK. So missing 16 days is average, or -
>
> Wilamek: Well, a little bit above average. But for Robert, it's real good.

(19) Defendant's undisputed fact # 125 states: "October 8, 1997, American Government instructor indicates Plaintiff refused to keep notebook...." Notes, p. 4075.

This "undisputed fact" is an exaggeration. Mrs. Moser testified:

> Moser: I never had a problem with Mr. Randall. He provided the work or came over or Robert could call him on the phone. They worked it out with each other, and even if Robert was very sick, he made sure that Robert got the core of what he needed to know, but he didn't have to do any of the extra.

. . . . .

> Stephens: OK. What is it about those [Mr. Overton's] accommodations that

you disagreed with, other than the fact that you did not want to have Robert, uh, ask a friend for the assignment if he were away for one or two days?

> Moser: And that I would pick it up. Uh, what did you ask me again?
>
> Stephens: What other things did you object to in terms of the accommodations that are listed here, other than the one you said before about not wanting Robert to ask a friend for the assignment?
>
> Moser: Uh, I don't think I had any, we didn't have any problems *in Mr. Overton's class.* [Emphasis added].

. . . . .

> Stephens: It sounds like Patti was kind of like a central figure, uh, in helping to coordinate things, Ms. Haskell, is that correct?
>
> Moser: Very necessary and central person. Yes. She put a lot of time, was very nice.
>
> Stephens: ... And then, we have accommodations from Ms. Oneto on the same page? Did you have objections to some of those accommodations?
>
> Moser: No. I was wondering why that [sic] notes weren't put on the, on the American Government class? But anyways, uh, these aren't, this isn't the 504 plan that we signed, or we talked about when we met with the teachers, but, in general, I guess it's the same. Do I have any problems with any of this?
>
> Stephens: Uh-huh.
>
> Moser: Well, I had to go get, first, the schoolwork out of it, that brown binder that she talked about, in the classroom, and that was kind of difficult, so, eventually, I got, I was able to get Patti, got the information and then, I, instead of trying to contact all of these

teachers, Patti became the one that, you know -

Stephens: Okay.

Moser:—I think Patti had to contact them, which I think would make it easier for Patti, it would have been nice if they didn't see Robert, just send it to Patti, and then, I pick it up.

Stephens: Uh-huh. Okay. But as far as the accommodations of English, you didn't have a problem with that? The last one, of course, is the, uh, physics program. And I'm not going to go through this again, because I think we spent a lot of time on this, but these are the accommodations. Uh, you can see at the bottom of the page, uh, that, uh, all of the teachers signed this document. But you did not sign this document?

Moser: No. I've never seen this document until today.

Stephens: So, we have to assume that Ms. Wright did not share this document with you, would that be correct?

Moser: Yes.

Stephens: *If you had seen this document, would have have signed it?*

*Moser: No.*

*Stephens: And the reason?*

*Moser: Because I don't agree with, uh, a student being responsible, and like I said before, if Robert was not there, I need to get the work as soon as possible, and, uh, what other reason here? Uh, I must have lost my train of thought.* [Emphasis added].

Stephens: Okay, well, I think you have sort of a sense, Mrs. Moser, of what you're requesting.

Moser: And I would have to have seen Patti on here be the coordinator on this.

. . . . .

Stephens: When you met, when you came in to meet with some of the teachers, did they, uh, discuss some of these accommodations with you at that time when you came in for a 7:30 a.m. meeting?

Moser: Yes, we went over, it was a different paper, though. We had a different paper.

Stephens: ... Did Ms. Wright, so Ms. Wright didn't even tell you that that document existed? That's your testimony?

Moser: I don't remember.

Stephens: Okay. And you don't have any recollection that she advised you not to sign it?

*Moser: Oh, I know she didn't tell me to sign it or not, I know I wouldn't sign it by what's in there.*

J. Moser, 1979–1983:26.

(21) Defendant's undisputed fact # 167 states: "Plaintiff believes he has the ability to advocate for himself." R. Moser 2232:1–19.

The cited testimony does not support this generalized statement as Robert stated he was still uncomfortable about doing it.

Hearing Officer: Okay. Okay. Just one last question. Jack Pool today testified that he recently had a meeting with you and your Mom and another counselor at Columbia—Paul, I think his name was. And you talked about, I guess about self-advocacy a little bit.

R. Moser: Um-hum.

Hearing Officer: Do you feel that you know where to go to get help when you need it at Columbia?

R. Moser: Um, I think I know where to go, yeah.

Hearing Officer: Okay. There were some discussion [sic] about you needed [sic] to talk to your instructors -

R. Moser: Yeah.

*Hearing Officer:—if you have a problem or if you need an accommodation. Do you feel more comfortable doing that now or -*

R. Moser: *I feel a little more comfortable. I'm still uncomfortable about doing it.*

Hearing Officer: Um-hum. Have you done that this semester with your instructors?

R. Moser: I've done it with one of my instructors.

Hearing Officer: And how did it work out?

R. Moser: It's working out good.

(22) Defendant's undisputed fact # 169 states, "Mr. Randall saw Plaintiff 2 to 3 times per week and 1 to 2 times per week after school and on weekends. Randall, 1790:3–9."

The cited testimony is from Dr. Patterson and deals with what Dr. Patterson would have done: "... Well and included uh, information. Now because there is the possibility that Robert might have been other health impaired, uh, knowing what we know from the record at this point in time, I probably would have talked to some teachers and, uh, asked to come in to view Robert across the day a couple of times, I would have attained his attendance records to see is there a ..."

(23) Defendant's undisputed fact # 171 states, "Algebra II was not particularly challenging, so Plaintiff was advanced to trigonometry. Plaintiff understood concepts of trigonometry very well. In fact, if Plaintiff attended college, he could take pre-calculus." Randall 1390:24–26; 1391:14–16; 1400:2–11; Randall 1401:1–3.

The cited testimony is as follows:

Randall 1390:24–26:

Randall: I'm gonna guess 15–20. Mainly were relatives.

Stephens: Did he have friends there, too?

Randall. Yes.

Randall, 1391:14–16:

Randall: Yes. He was in a regular algebra 2 class and math is one of the areas where I think Robert has a strong aptitude. And, the course wasn't particularly challenging for him. That's one of the reasons ...

1400:2–11:

Randall: Yeah. Um, the concern I had with what he has done in trig is that the material for which he was present for which he did work, he grasped it very well.

Uh, but there were—because of the absences and because of the homework, there were some topics, some chapters that he had huge holes. And I did not penalize him for not having that material, but evaluated him based on the materials he did achieve.

Stephens: Did he have the opportunity to, uh, contact you to—for some tutoring to make up these deficits?

Randall: Yes.

1401:1–3:

Randall: Yes. We discussed that. He and I discussed it where when he went to college that the course to continue with would probably be a pre-calculus class, and that some of the topics would be ones that he saw ...

Testimony not cited does indicate Robert was advanced to trigonometry without meeting the prerequisite (AR 1391:17–23).

(24) Defendant's undisputed fact # 173 states, "Plaintiff was on medications during his senior year which changed 5–7 times, but failed to inform school." J. Moser 1938:21–24.

This statement is untrue. The cited testimony does not support the contention that Plaintiff did not inform the school. The citation also ignores Ms. Stephens' comments and Mrs. Moser's testimony just prior, where Mrs. Moser specifically states she told the school about the medication changes. The cited testimony is:

Stephens: At this point, I don't think I need them. How many times would you say that the medications were changed during Robert's senior year?

Moser: Five or seven times.

The entire exchange, including the cited testimony, is:

Ms. Stephens: I think that there's evidence that, uh, Mrs. Moser testified earlier that, uh, Dr. Stoke had prescribed various medications to deal with depression and some of these, uh, medications, I think were, what I would call, heavy-duty medications in terms of psycho-tropic, uh, drugs and that schools should be notified that the child is going to be taking these kinds of drugs. So, that's why I wanted to know if there was ever any attempt to contact the schools about this.

Hearing Officer: You may answer the question.

Moser: Uh, I know that I wrote a letter asking him to, uh, the school, asked me to do something like that, so, I wrote a letter and I think only Dr. Lee responded to the school. *And then, when, when he started taking different medication, I came in and told Sandy as it went along like we're changed to a different medication,* 'cause she was very, Sandy is very kind and I felt like she cared, if I came in and told her what was going on.' She was a very nice counselor. So, I have the names of the drugs if you want them.

Stephens: At this point, I don't think I need them. How many times would

you say that the medications were changed during Robert's senior year?

Moser: Five or seven times.

Stephens: *Five to seven?*

*Moser: I couldn't tell you exactly.* [Emphasis added].

(25) Defendant's Undisputed Fact # 197 states, "Based on Dr. Trotter's review of records and conversations with the Mosers, he believes that since Robert was within normal expectations for his grade level, he probably would not be afforded special education services under other health impairment criteria, but he would perhaps be eligible probably for 504 plan accommodations." Trotter, 283:22–24; 284:10–16.

Defendant mis-cites testimony and omits Dr. Trotter's comments just prior to the cited testimony where he says he is speaking "in generalities" and "hypothetically" as to *"if* Robert was doing within normal expectations for his grade level ..." Dr. Trotter *does not state* that "he believes that since Robert was within normal expectations for his grade level." Trotter, 283:22–24, states:

Graves: Okay. Based on your review of the records and conversations with the Mosers, how long do you think Robert would have been eligible to be treated as an OHI student under IDEA?

Trotter: Well, as long as he was in school, and then I don't know how the junior college component—how they—how their student services ...

Trotter, 284:10–16, states:

Graves: The general testing?

Trotter: Yeah, he was functioning, you know, despite his illness, he was managing to process more information quite well. We can only conjecture if he wasn't, how well he would be doing.

But he still met the threshold of average performance.

Graves: Okay.

Trotter: In my understanding, we're saying that he wouldn't be lost in a [regular class].

Not cited by Defendant are the prior lines of testimony on page 284, by Dr. Trotter:

Graves: Oh, I'm talking about before you came on board. How long—how many—at one point do you think he became eligible as an OHI student?

Trotter: Well, again, it's based on the—you know, again I can only talk hypothetically, not specifically to Robert's case. *But if he was doing within normal expectations for his grade level,* he probably would not be afforded special ed services under OHI, but he would perhaps be eligible for probably 504 plan accommodations. *But these are generalities, okay, not specific to this case, because I was not part of the IEP team.* [Emphasis added].

(26) Defendant's Undisputed Fact # 217 states, "deficit in spelling did not affect plaintiff's writing competence" and cites "Patterson, 1279:1–12."

Dr. Patterson was Plaintiff's expert. The cited testimony was from Michael Harrison, Defendant's school psychologist, not Dr. Patterson. Michael Harrison's full testimony on the issue, at AR 1279:12–27, 1280:8–12, does not support Defendant's generalized claim:

Harrison: There seemed to be a deficit in spelling, but it did not seem to be having a significant effect on his writing competence. It seemed to be more related to spelling itself.

*Graves: Okay. And did you notice errors in his writing itself?*

*Harrison: Um—that would have been scored by the resource specialist.* And when I look at just the results of that testing, um, what was told to me and what was demonstrated by the formal results of the test was that his writing skills were within the average range.

*Graves: Okay. Was he making any grammatical errors that you're aware of?*

*Harrison: That would—that would need to be, I would want the resource specialist, the person who had actually given that test to speak to -*

Graves: Okay. And were you able to review the actual sample of the writing he had produced for that test?

Harrison: Hm hmm. Hmm. I saw, um, copies of a -

Graves: Okay. And do you know where those will be now?

Harrison: I think I passed them up even....

Harrison: I don't believe that I was given any of that in preparation for this, um, it would be typical in an IEP meeting that I would look over the results the resource specialist had, um, *I think the only thing I've seen written out is just results of the—the from the previous ability test, (unintelligible) tests that has been given.*

3. *Misstatements and Mischaracterizations of Applicable Law*

(1) Counsel stated in her July 31, 2002, brief:

Procedural flaws do not automatically require a finding of a denial of FAPE. (*See, W.G. v. Board Trustees of Target Range School District,* 960 F.2d 1479, 1484 (9th Cir.1992)). In fact, the U.S. Supreme Court defined what is meant by a 'free appropriate public education' and concluded that the IDEA does not require that a student be provided with the best available special education services or that the services maximize each

child's potential. It also concluded that the basic floor of opportunity provided by the Act consists of access to education which provides some educational benefit. Doc. 80, Def.'s Memo re Summary Judgment, at 31:15–21.

Defendant's partial presentation of IDEA case law ignores and obfuscates the central role procedural safeguards play, which counsel, as an educational law specialist, should know are the basic tenets of established IDEA case law. The case counsel cites does say that procedural defects are not per se violations, but the *complete citation* states: "Procedural flaws do not automatically require a finding of a denial of a FAPE. *However, procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process clearly result in the denial of a FAPE.*" *W.G. v. Board of Trustees of Target Range School Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir.1992) (emphasis added).

Counsel's selective partial citation is misleading and attempts to obscure the rule regarding procedural safeguards and instead create the false impression that minimal educational benefit is the *only* measure of what constitutes a FAPE, when the applicable case law says no such thing:

> When a district fails to meet the procedural requirements of the Act by failing to develop an IEP in the manner specified, the purposes of the Act are not served, and the district may have failed to provide a FAPE. The significance of the procedures provided by the IDEA goes beyond any measure of a child's academic progress during the period at issue. As the Court in *Rowley* said, "Congress placed every bit as much emphasis upon compliance with

procedures giving parents and guardians a large measure of participation" at every step "as it did upon the measurement of the resulting IEP." *Rowley*, 458 U.S. at 205–06, 102 S.Ct. 3034.

*W.G. v. Board of Trustees of Target Range School Dist. No. 23*, 960 F.2d 1479, 1485 (9th Cir.1992). Plaintiff's portrayal of *Rowley* as simply requiring a minimum of "some educational benefit" to the exclusion of procedural safeguards severely mischaracterizes the law, in what can only be interpreted as an intentional attempt to mislead the court. Counsel's conduct goes far beyond the vigorous advocacy of distinguishing cases or holdings harmful to its position; counsel actively misrepresents the basic standard by which IDEA cases are judged.

(2) Counsel stated in her brief of June 4, 2001, that Plaintiff could not be reimbursed for the purchase of a computer, internet access fees, and counseling because "20 U.S.C. § 1412(a)(10)(C)(iii) requires that the parents give written notice to the District before they can be reimbursed for educational services unilaterally purchased." Doc. 25, Def.'s Brief re De Novo Review, at 36:21–26. Counsel repeats this claim in its opposition to Plaintiff's Motion for Summary Judgment. *See* Doc. 87 at 34:5–10.

Review of the citation from the IDEA and the context in which it is made reveals that counsel seriously mischaracterized the law. First, the cited text only discusses a situation where the child is enrolled in private school without the consent of the public agency. 20 U.S.C. § 1412(a)(10)(c). Second, there may be a denial of reimbursement for private school fees if the parents did not notify the public agency prior to the child's *removal from public school.* 20 U.S.C. § 1412(a)(10)(C)(ii and iii). Third, the parents have to be notified of the requirements under this section. 20

U.S.C. § 1412(a)(10)(C)(iv). Plaintiff did not enroll in private school; he was not removed from public school; he was not seeking private school fees; and there is no evidence his mother received any kind of notice from Defendant about the requirements. The cited portion of the IDEA does not say what Counsel suggests it says. Plaintiff explained in detail why counsel's statement of the law was wrong in the reply of October 15, 2001. *See* Doc. 44, Pl.'s Answer to Evidentiary Objection at 55:1–22. Yet, on August 15, 2002, Defendant's counsel reiterated the identical (wrong) characterization of the law in the exact same language, verbatim. *See* Doc. 87, Def.'s Opposition re Summary Judgment at 34:5–10.

Lozano, Smith attempts to explain away this mischaracterization as a mere "mistake." Lozano, Smith's explanation is untenable given the repeating of this misstatement of law after it was challenged.

(3) Counsel also suggests that accommodations that satisfy Section 504 of the Rehabilitation Act would satisfy IDEA requirements. Doc. 41, Def.'s Further Brief re Do Novo review, at 12:7–11 ("There is no law preventing regular education accommodations, being developed as part of a Section 504 plan, to be written as a document separate and away from the IEP process. Moreover, the 504 accommodations were subsequently adopted by the IEP team as part of Plaintiff's IEP"). Defendant attempts to perpetuate this deception in the opposition to Plaintiff's Motion for Summary Judgment by claiming the District provided a FAPE based upon those accommodations allegedly made under Section 504 of the Disability Act. *See* Doc. 87, at 24:4–20.

██ This is plainly not the law as discussed in detail in the Memorandum Decision and Order. *See* Doc. 102. A school has no leeway to substitute a 504 Plan for required IEP/IDEA services. "Both sections 504 and IDEA have been interpreted as requiring states to provide a free appropriate public education to qualified handicapped persons, but only IDEA requires development of an IEP and specifically provides for transition services to assist students [to] prepare for a post-high school environment. *See* 20 U.S.C. § 1401(a)(20). Under the statutory scheme, the school district is not free to choose which statute it prefers." *Yankton School District v. Schramm*, 93 F.3d 1369, 1376 (8th Cir.1996). "[T]he District should have devised an IEP to meet [the student's] unique needs in compliance with the provisions of the IDEA, and its proposed plan under § 504 of the Rehabilitation Act was not an adequate substitute." *Muller ex rel. Muller v. Committee on Special Educ.*, 145 F.3d 95, 105 (2d Cir. 1998).

### 4. Adaptive Physical Education Requirements (APE)

Defendants argued in their June 4, 2001, brief at p. 26:18–22:

APE is the most restrictive form of physical education and is not provided unless (1) a student cannot participate in regular physical education classes to support his equal participation; (2) modifications cannot be made to the student's regular physical education; and (3) specially designed physical education would not be appropriate.

Plaintiff rejoined that 5 Cal. Cr. C. § 30515 in truth provides:

[c]onsultative services may be provided to pupil, parents, teachers, or other school personnel for the purpose of identifying supplementary aids and services of modifications necessary for successful participation in the regular education program or specially designed physical

education programs [in special day classes].

Defendant's argument that APE services required Robert be exempted rather than aided by APE to access physical education was at the least a distortion, if not a misrepresentation of the law, which encourages APE services to teach students to work around limitations to facilitate participation activities with non-disabled peers.

5. *Standard for Entitlement to Extended School Year Services.*

Defendant, in opposition to summary judgment at p. 27:9–12, argued that extended school year services are only warranted for students who face regression, in the event that services are interrupted. Defendant argued that Robert did not need "extensions" into the summer and should be judged by what he completed by the end of the school year, based on Defendant's claim that California's ESY regulation provides that "ESY services are provided when 'an interruption of the pupil's educational programming may cause regression.'"

■ To the contrary, regulation does not require proof of regression and in substance calls for extended school year services to be provided to each individual with exceptional needs who has unique needs and requires special education and related services in excess of the academic year. Such individuals have handicaps likely continued indefinitely or for a prolonged period and interruption of the pupil's educational programming may cause regression, when coupled with limited recoupment capacity, rendered impossible or unlikely the student will attain the level of self-sufficiency and independence that would otherwise be expected in view of his or her handicapping condition. The lack of clear evidence of such factors may not be used to deny an individual an extended school year program if the Individual Education Program team determines the need for such a program and includes extended school year in the individualized education program pursuant to subsection (f). As Plaintiff correctly notes, under federal law, regression-recoupment is not the standard for availability of ESY services. *Johnson By and Through Johnson v. Independent School Dist. No. 4 of Bixby, Tulsa County, Okla.,* 921 F.2d 1022, 1027–28 (10th Cir. 1990) (citing *Alamo Heights Ind. Et. School Dist. v. State Board of Education,* 790 F.2d 1153, 1158 n. 3 (5th Cir.1986)).

6. *Whether Robert's Parents Were Barred From Reimbursement By Failure to Provide Notice To the District Before Making Expenditures On Robert's Behalf.*

Defendant argued that 20 U.S.C. § 1421(1)(10)(C)(iii) requires parents to give written notice to the District before they can be reimbursed for educational services unilaterally provided and that Robert's parents did not give Defendant District such notice. Brief filed June 4, 2001, p. 36:24–26. The reference section does not require advance written notice before reimbursement for educational services unless the student previously received special education and related services under the authority of a public agency and are removed by parents to be enrolled in a private elementary or secondary school without the consent of or referral by the public agency, and the parents seek reimbursement for the cost of that enrollment. The written notice requirement only applies if parents have been given notice of the requirement. Here, there is no showing Defendant ever gave such notice. 20 U.S.C. § 1412(a)(10)(c)(iv)(IV).

This section of law did not become applicable in California until January 1, 1999, after it was added to federal law by Stats. 198, c. 691 (S.B.1686). After notice of the error, Defendant continued to advance the argument.

## B. *Attacks on Plaintiff and Plaintiff's Counsel.*

Separate from the distortions and misrepresentations detailed above, Ms. Yama and Lozano Smith engaged in ad hominem attacks on Plaintiff, suggesting he had a bad attitude and was a malingerer. They also attacked Plaintiff's counsel with accusations she was mischaracterizing the record and falsely attributed arguments in the federal case to Plaintiff that Plaintiff's counsel did not advance.

## C. *Elaine Yama*

Ms. Yama has submitted a separate brief and declaration which attempts to explain that the misstatements and frivolous objections were due to either mistake, misunderstanding, or carelessness. *See* Yama Decl., Doc. 132 and Yama Supplemental Decl., Doc. 154. Ms. Yama contends she misunderstood the nature of the proceedings and did not realize they were to be conducted as a "standard summary judgment motion," with separate statements of undisputed facts. *Id.* Ms. Yama contends she believed she was merely submitting a statement of chronological facts, and that in this statement she could state "any fact which had a scintilla of evidence in support of it," regardless of credibility issues or the strength of evidence to the contrary. *Id.*

In support of this explanation, Ms. Yama points to her December 7, 2001, letter to the Court where she proposed an alternate method of proceeding with summary judgment. *See* Doc. 132, Exh. B. Ms. Yama proposed that:

Each party submit a 'Chronological Statement of Material and Relevant Facts,' following a format similar to that set forth in this Court's Local Rule 56–260. The Chronological Statement of Material and Relevant Facts shall enumerate discretely each specific material and relevant fact and cite the particular portions of the administrative record relied upon to establish that fact.

Yama Decl., Doc. 132, Ex. B, at 2. The letter also made two other substantive proposals: "Chronological Statement of Material and Relevant Facts will be filed with a Brief" and "Failure to support a fact or disputed fact by appropriately citing to the administrative record, will result in a finding that the fact is unsupported and it will be disregarded by the Court." Yama Decl., Doc. 132, Ex. B, at 2.

By this letter, Ms. Yama sought to create an unorthodox procedure which she claims partially excuses two areas of improper conduct. Ms. Yama points to her suggestion that all facts had to be cited to the administrative record, as justification for her patently frivolous objections to Plaintiff's statement of simple, indisputable background facts. Ms. Yama also explains her misstatements and mischaracterizations of the administrative record and law were based on her "belief" that the existence of some faintly colorable evidence was sufficient to substantiate a "fact" for inclusion in the Chronological Statement of Material and Relevant Facts in the face of much stronger evidence contradicting that "fact." As she has stated, "I understood that the parties were not submitting *undisputed* facts, as would normally be the case with a summary judgment motion. Accordingly, I never referred to my statement of facts as 'undisputed' facts." Yama Decl. Doc. 132 at 2:20–22 (emphasis in original).

Ms. Yama also states without explanation that she "assumed that the Court agreed and understood that the statements would not constitute a true effort to set forth 'undisputed facts.'" *See* P & A by Yama, Doc. 134 at 23–25. As a seventh year associate Ms. Yama should have had enough experience with the courts to know that once she proposed a significant and unproductive departure from the Federal Rules of Civil Procedure, by informal correspondence to the court, she had no basis to "assume" the court's lack of response to her letter request was acceptance of that proposal, absent a court order. Counsel may not offer: "here is my proposition, if I don't hear from you within × number of days I will assume you agree or have no objections." Ms. Yama's contention that she believed she had court approval of her unprecedented request is untenable. Ms. Yama's explanation ignores that in her very same December 11, 2001, letter to the court, she also suggested that the parties be limited to 50 facts and 15 pages. Yet her submission of Defendant's chronological statement of facts included 221 facts in 30 pages. This submission indicates that either Ms. Yama was picking and choosing which of her December 11, 2001, suggestions she "assumed" the court had accepted, or she is simply attempting to excuse the inexcusable by presenting this letter as a *post hoc* rationalization.

The latter is more likely true given Ms. Yama's letter to the court, dated July 26, 2002, which accompanied Defendant's submission of an *amended* Response to Plaintiff's Separate Statement of Chronological Facts.[7] *See* Doc. 155. On July 26, 2002, Ms. Yama states:

> After reading the Court's most recent decision, Defendant's *counsel now understand that they misinterpreted the Court's order.* Defendant's counsel believed that the procedure to be utilized in this review of the hearing officer's decision was a format of modified summary judgment. *However, it now understands that the Court ordered a formal summary judgment procedure.* Defendant's counsel apologize for its misinterpretation and any inconvenience to the Court or Ms. Graves that our misinterpretation may have caused.
>
> To conform to the Court's order, Defendant therefore provides the enclosed Amended Response to Plaintiff's Statement of Chronological Facts....
>
> The Amendment consists of exchanging the words, "No Response" to "Undisputed." Also, the Amendment consists of adding the word "Disputed" prior to all other responses, to which Defendant objected and/or responded.

*Id.*

Ms. Yama's letter admits she knew that the proceedings were governed by the FRCP applicable to summary judgment. Ms. Yama modified Defendant's Response to Plaintiff's Separate Statement of Chronological Facts based upon her understanding. Defendant's modified response continues to include the many frivolous and vexatious objections listed by the Court in both its Memorandum Opinion on the Motion for Summary Judgment (Doc. # 102) and the Court's Order to Shaw Cause (Doc. # 101). Ms. Yama could have corrected Defendant's Response and Objections to Plaintiff's Statement of Chronological Facts and Defendant's own Separate Statement of Chronological Facts by submitting a similarly amended statement or an errata, to correct those statements of fact that were not supported by the record. She consciously chose to do neither.

---

7. Ms. Yama inexplicably neglects to include a copy of this correspondence with her declaration in response to the Order to Show Cause, another omission of relevant facts.

For example, one of the "disputed facts" pointed out in Ms. Yama's July 26, 2002, letter is fact # 16, which Defendant "changed from 'no response' to 'disputed' because Defendant did not realize the conflict in the date referenced." *See* Doc. 155. This very objection is noted in the Order to Show Cause (Doc. # 6 at 27) as "confusing at best and misleading at worst" because the date on the doctor's P.E. excuse note clearly states Mr. Moser was seen August 1994, yet Defendant's amended response attempts to suggest the diagnosis was on the date the doctor's note was signed, in 1995. This was done despite unequivocal reference to the diagnosis date as August 1994. It is impossible to interpret this objection as anything other than intentionally misleading, especially when combined with the letter to which it is attached.

Ms. Yama's attempts to excuse her behavior by contending she was operating under the assumption that the hearing officer "accurately described" the facts in the administrative record is not credible. *See* Doc. 134 at 10:10–16. The review was "de novo;" Ms. Yama knows the standards governing de novo review and the case law which holds that while deference is given a hearing officer's fact findings, that deference is only given if the hearing officer does a thorough and complete job. *Adams v. Oregon,* 195 F.3d 1141, 1145 (9th Cir. 1999); *see also,* Doc. 102 at 114. Any deference due the hearing officer's decisions regarding the law is irrelevant to Ms. Yama's misstatements of fact. Any deference due the hearing officer's findings of fact is made moot by Ms. Yama's *actual knowledge* that her characterizations of

factual issues she included in the Motion for Summary Judgment pleadings were, *at a minimum,* highly suspect. By the time Ms. Yama received Plaintiff's complaints about her misstatements in the Trial De Novo briefs, as well as two letters requesting Defendant correct the record with the Court, she waived any entitlement to rely upon allegedly incorrect findings of fact provided by the hearing officer.[8]

Assuming, *arguendo,* that Ms. Yama's reliance on the SEHO hearing officer was in good faith, a party is responsible for innocent, good faith mistakes of law or for carelessness of counsel, because reasonable inquiry would reveal a mistake, and counsel who is careless has not made reasonably inquiry. *Lloyd v. Schlag,* 884 F.2d 409, 412 (9th Cir.1989). Ms. Yama's alleged "reliance" on the SEHO officer's recitation of the record is also not reasonable under the circumstances, given: 1) the Hearing Officer apparently wrote his decision without the benefit of a transcript of the hearing; and 2) Defendant's misstatements of *fact cite the transcript* (administrative record), not the Hearing Officer's erroneous decision. *See, e.g.,* Doc. 68.

Ms. Yama contends she "made a number of mistakes" in the papers she submitted, but that these were "honest mistakes resulting from her confusion, misunderstandings, incorrect assumption, and her failure to double check her factual citations." Doc. 134 at 1:24–28. However, taken as a whole, Ms. Yama's pattern of practice does not support the position that she was merely negligent in her reading of the record. Plaintiff's counsel made numerous objections to Plaintiff's statements (some

---

**8.** Neither Ms. Yama nor Lozano Smith point out which misstatements they made that were allegedly repeated from the Hearing Officer's decision. The bulk of facts contained in the Hearing Officer's opinion are in his "Background Section," not in the "Findings of Fact

and Conclusions of Law" to which Ms. Yama and Lozano Smith contend deference is owed. Given that the briefs cite the administrative record in support of the misstated facts, and not the Hearing Officer's opinion, the argument is specious.

correct, many incorrect) citing to the text of the administrative record. To then turn around and claim that defense counsel's own mischaracterizations are due to her lack of familiarity with the record or a failure to carefully cite to the record is disingenuous.

While isolated errors or misstatements might be excused given the size of the record, the sheer volume of misstatements coupled with the fact that they universally favor the Defendant suggests a concerted attempt to distort the record to make it say what it does not. For example, in addressing the sample of issues listed in the Order to Show Cause, Ms. Yama admits she overstated or incorrectly stated the evidence at least seven times and made a mistake in her interpretation, reading, or note taking with regard to the administrative record approximately *seventeen times.* Ms. Yama admits her objections to Plaintiff's facts were "hyper technical," i.e., *frivolous,* improper or unclear at least six times. She acknowledges that on at least four occasions she objected to obviously indisputable facts simply because Plaintiff did not cite to the record, based on her self-suggested assumption that the proceedings would not be subject to the federal rules of civil procedure governing a summary judgment motion (an assumption which has since been disproved by Ms. Yama's July 26, 2002, letter acknowledging she understood the nature of the proceedings).

■ Taken as a whole, Ms. Yama admits she made mistakes, misinterpreted the evidence, overstated the facts or made hyper-technical or improper objections approximately *thirty-four* times. These examples are limited to the instances of problems listed in the Order to Show Cause. The only reasonable inference that can be drawn is that Ms. Yama and her law firm intended to obstruct at every step

and stand education law on its head. A filing is frivolous under Rule 11 if it is unreasonable when viewed from the perspective of a competent attorney admitted to practice before the district court. *G.C. & K.B. Investments,* 326 F.3d 1096, 1109; *In re Grantham Bros.,* 922 F.2d 1438, 1442 (9th Cir.); *Zaldivar,* 780 F.2d at 831.

A negligent or too attenuated examination of the record would not result in the extremely skewed view of the record Ms. Yama presented. Her presentation was carefully constructed to omit or minimize adverse facts, *e.g.,* portions of transcripts were cited out of context to support made-up facts, that, when viewed in their entirety, contradict the true record. It is obvious Ms. Yama clearly scrutinized the record to explicitly cite only portions of it, or to refer to testimony favorable to the District, but was only "mistaken" when she misrepresented the remainder of the record, her explanations are not credible. "A district court confronted with solid evidence of a pleading's frivolousness may in circumstances that warrant it infer that it was filed for an improper purpose." *Townsend v. Holman Consulting Corp.,* 929 F.2d 1358, 1365 (9th Cir.1990).

Counsel found ways to ostensibly conform record references to support Defendant's case by misreading context, omitting critical facts, and sometimes by simply stating the opposite of what was in the record. This kind of disinformation is insidious because it was provided by an officer of the court. It created a greater burden on plaintiff and the court. Defendant's counsel treated the law with the same contempt for accuracy. Attorneys have a duty to actively advocate on behalf of their clients but they have no duty to misrepresent facts or misstate law. Rule 11 creates and imposes on a party or counsel an affirmative duty to investigate the law and facts before filing; *Rachel v. Ba-*

*nana Republic, Inc.,* 831 F.2d 1503, 1508 (9th Cir.1987) and further obliges an attorney to dissuade a client from pursuing specious claims, to avoid possible sanctions by the court, as well as unnecessary costs of litigating a worthless claim. *Mohammed v. Union Carbide Corp.,* 606 F.Supp. 252 (E.D.Mich.1985).

Ms. Yama repeatedly states that the administrative record and the appeal process was so difficult and confusing that these factors significantly contributed to her "mistakes." While the administrative record was voluminous and in many cases duplicative, the standards by which a district court reviews a hearing officer's decision are clearly set out in easily accessible case law, as is evidenced by Defendant's invocation of one (but not all) of those standards in its summary judgment brief. It is not credible to suggest a seventh year associate, practicing for three years in education law, could not keep the record straight and address the issues raised by Plaintiff.

It is difficult to ascertain whether counsel has taken seriously the duty of honesty and candor owed to the Court. Every time a party submits a filing, the attorney personally certifies the contents both as to reasonable factual investigation and legal research. *See* Fed. R. Civ. Pro. 11(b). This professional responsibility transcends the role of advocate and duty to the client if the two conflict.

Ms. Yama's declaration and brief in response to the Order to Show Cause give the impression she is a neophyte lawyer who was unable to grasp the complexity of the case or record and made a few errors due to her misunderstanding of the specialized nature of the law, the proceedings and the record. This portrayal is belied by the history of the case and Ms. Yama's experience. Ms. Yama is not a first year attorney, she is a *seventh* year attorney—

in some firms she would already be a principal. She has been practicing in the area of education law for over three years, for a law firm which holds itself out as a leading specialist in California in this area of law.

█ Assuming, *arguendo,* that a seventh year attorney is somehow not experienced enough to understand the nature of a summary judgment proceeding or to verify the record facts or the law underlying her legal arguments, as an attorney licensed to practice law in the State of California, Ms. Yama had an ethical obligation to ask for help and get instructions from her superiors if she truly could not deal with the "complexities" of the case. Rule 11 creates and imposes on a party or counsel an affirmative duty to investigate the law and facts before filing. *Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1508 (9th Cir.1987).

What is hard to understand is Ms. Yama's alleged inability to understand the background of the case before submitting briefs, verifying statements of fact against the record, and asking for help, if she needed it. All of these actions, Ms. Yama now contends she will take in the future, are actions that should be second nature to a seventh year associate. It should not require an Order to Show Cause proceeding and prospect of sanctions to actuate professional responsibilities.

Ms. Yama's contention that this is not a situation where she "knowingly concealed material facts or knowingly asserted a frivolous position," (Doc. 134 at 12–13) is simply untrue given the evidence discussed in this order. Ms. Yama still does not candidly accept responsibility for her actions, instead she repeatedly states only that "mistakes were made." *See* Doc. 134. Her assertions that the "pressure of private practice" requires that mistakes will

inevitably be made, demonstrate her complete lack of understanding of her ethical responsibilities as an officer of the court or the serious nature of this proceeding and the allegations against her. Ms. Yama's contention that while the "mistakes" she made "may be the result of a certain degree of carelessness, they do not involve the type of recklessness required to warrant [Sect.] 1927 sanctions," is contradicted by the evidence. Ms. Yama made more than a few "mistakes" and was much more than simply "careless." She was reckless. She systematically distorted the record and repeatedly ignored Plaintiff's objections and warnings that she was doing so.

In fact, Ms. Yama's declaration in response to the Order to Show Cause, in at least two instances evidences that she still doesn't "get it." Ms. Yama contends Defendant's Fact # 37 is supported by the testimony of Mr. Smith, that he, himself, was not aware of Robert's transfer to Arnold High School. Doc. 134 at 17:5–15. Defendant's fact # 37 states: "[a]t the end of his first semester of 9th grade Plaintiff's mother transferred her son from Bret Hart High School to Arnold High School without alerting Bret Harte High School staff or discussing her decision with anyone." Ms. Yama's explanation ignores the actual language used in reciting this fact— defendant doesn't say *Mr. Smith* was not alerted, Defendant says: 1) *none* of Bret Harte's staff was alerted; and 2) Mrs. Moser *didn't discuss* her decision to transfer Robert *"with anyone."* Citing to Mr. Smith's testimony does not excuse the falsity of this statement. Ms. Olsen–Miller had actual knowledge of Robert's transfer. Whether or not she actually discussed it with Mr. Smith, and whether that creates some conflict in the facts, is irrelevant.

Defendant claimed *"no one* knew of the transfer," however Defendant's own employee, Ms. Olsen–Miller expressly admitted she knew of Robert's transfer to Arnold in at least November or December. This is a direct falsehood; Ms. Yama's explanation only exacerbates it.

Regarding Plaintiff's fact # 96, Ms. Yama admits her objection was "overly technical" because she believed "it was proper to object to Plaintiff's contentions if they did not constitute a verbatim recitation of the evidence." Ms. Yama now realizes that if the statement she objected to was substantively supported by the evidence, she should not have objected to it. Ms. Yama attributes her "over technical" objection to her "limited experience." A seventh year associate's explanation that this error was due to limited experience is patently unreasonable.

Taken as a whole, Ms. Yama's repeated misstatements of the facts, frivolous objections, and mischaracterizations of law, when combined with the fact that she was placed on notice of her transgressions no less than four times by Plaintiff's counsel, throughout the painful progress of trying to get the summary judgment motions before the court for decision,[9] cannot be interpreted as anything other than a bad faith attempt to mislead the Court, obscure the real facts of the case, to obstruct, and/or harass the Plaintiff. This was an effort to either wear down the Plaintiff or to win a victory for Lozano Smith's client that was clearly unjustified by either the facts or the law. These actions violated provisions of Rule 11(b)(1), (3), and (4), as well as § 1927.

Ms. Yama has been involved in at least four other special education cases. Graves Decl., Doc. 151, at 1:23. In California,

---

**9.** In many instances, Plaintiff provided very specific examples of misstatements and citation to the correct section of the record, which provided Ms. Yama, Lozano Smith and Defendant with an easy guide to correct these misrepresentations.

Lozano Smith is a self-proclaimed major firm in the education law field. It can only be hoped that these practices are not the standard mode of operation for Lozano Smith attorneys, due to their potential to materially harm other special education plaintiffs.

Ms. Yama's protestations that she never meant to submit any incorrect, improper, or misleading pleading (Doc. 134 at 2:18–24), nor did she mean to harass opposing counsel, rings hollow, given: 1) the express notice she was given that she was doing so; 2) the numerous opportunities she had to review and correct the falsifications contained in the pleadings repeatedly pointed out by opposing counsel; and 3) the repetitive nature and extent of her "errors."

Ms. Yama's claim that there was no other Lozano Smith attorney to help her understand the administrative record is equally unavailing. *See* Doc. 134 at 4:6–8. According to the District's responses to Plaintiff's interrogatories, Ms. Yama made no attempt to contact the District's attorney who handled the administrative hearing and was presumptively intimately familiar with that record. At least two other Lozano Smith attorneys were "of record" on the pleadings. There is no suggestion the District's attorney was unavailable for *consultation* over the course of this litigation.

Ms. Yama states she is unlike those attorneys who have received Rule 11 sanctions for ongoing or repeated conduct and she does not believe in "pushing the ethical envelope." This case is entirely about Ms. Yama, Lozano Smith and Bret Harte Unified School District "pushing the ethical envelope" and engaging in ongoing and repeatedly deceptive and obstructive conduct throughout the case's several year history.

Ms. Yama claims that she acknowledged responsibility for her mistakes by accepting, without objection, the corrective measures voluntarily imposed upon her by the Lozano Smith firm. However, in this order to show cause proceeding, she repeatedly attempts to attribute her breaches to inexperience and confusion (as a seventh year associate specializing in education law). This calls into question the bonafides and true extent of her acceptance of responsibility for her conduct.

When an attorney repeatedly and vexatiously presents "facts" and "law" to the Court that are plainly wrong or misleading, which needlessly prolong and multiply the summary judgment proceedings and materially increase the burden on the Court, bad faith can be inferred. Appropriate sanctions can be imposed under the authority of both 28 U.S.C. § 1927 and the inherent authority of the Court. Ms. Yama's admissions that she did not review the pleadings or the record before submitting her objections and misstatements of disputed facts, shows she acted unreasonably. Any competent attorney would have made such an investigation, as required under Rule 11 to determine the accuracy of the statements of undisputed facts, the law, and grounds for objections. The substance of Ms. Yama's opposition is not that she has fully and unequivocally accepted responsibility for her breaches of duty and the rules of professional conduct.

Sanction authority exists under Rule 11(b)(1), (3) and (4) for the frivolous objections, misstatements of fact and law contained in her Summary Judgment pleadings under 28 U.S.C. § 1927 and the Court's inherent power, for her steadfast refusal to correct these errors when faced with repeated objections and explicit notice that her papers were inaccurate and misleading, in violation of her duty of truth and candor to the Court. It is reasonable to infer that Ms. Yama should have known that her efforts amounted to obstruction of

the just resolution of the case and harassment of the Plaintiff.

### D. *Lozano Smith*

██ Lozano Smith characterizes itself as a "recognized leader" in special education law in California and that it provides training seminars for special education attorneys and administrators. Mr. Fulfrost, the managing partner of Lozano Smith's Santa Monica Office was heavily involved in the early stages of this case and is an expert in special education and students with disabilities. *See www.lozanosmith.com,* accessed October 11, 2004. Mr. Smith is a former Senior Deputy County Counsel for Fresno County Schools and has been practicing law for 24 years. *Id.* Mr. Sklar was admitted to the bar in 1995 and lists his specialty as Education Law. *Id.* Ms. Yama practices law with a primary focus in special education and has assisted school districts with IEP meetings, mediation and due process hearings and has presented at workshops related to special education in California. *Id.* Mr. Fulfrost, Mr. Smith, and Mr. Sklar further all actively worked on this case at various times as detailed by Plaintiff's submission filed February 25, 2004, pp. 2:5–4:4, and the submission filed November 5, 2003, pp. 5:23–6:10 and 7:17–8:12.

Lozano Smith contends that the mistakes made in this case are the result of Ms. Yama's actions and Ms. Yama's actions alone. *See* Doc. 137, Lozano Smith Memo re OSC, 3:7–15. Mr. Smith has stated that Ms. Yama was an experienced attorney who he felt (based on an active working relationship over a four year period) could handle the case and submit pleadings without direct supervision. *See* Smith Decl., 2:3–3:2. Lozano Smith appears to argue that because it previously provided Ms. Yama with "sufficient training" and "supervision," the firm has not engaged in bad faith sanctionable conduct. Lozano Smith ignores the fact that Ms. Yama was not the only attorney who signed misleading pleadings and it ignores the repeated objections and warnings from Plaintiff about its malfeasance.

The various papers filed with the Court were signed by no less than three Lozano Smith attorneys: Edward Sklar, Elaine Yama and Michael Smith, a founding shareholder. In fact, Ms. Yama states she did not write, but merely incorporated, the distorted and incorrect legal arguments from the Trial De Novo brief written by Mr. Sklar.[10] *See* Doc. 154. This raises question whether a culture of misrepresentation and deception exists at Lozano Smith, if an attorney more senior than Ms. Yama (who already has seven years experience), submitted the previously discussed misleading and inaccurate legal papers.

Lozano smith contends, without citation, that recklessness alone is not enough for sanctions under 28 U.S.C. § 1927. Doc. 136 at 5:11 and at 6:9–11. This is not entirely accurate. Under *Fink v. Gomez,* 239 F.3d 989 (9th Cir.2001), the Ninth Circuit recently reconciled its prior cases and stated: "[R]ecklessness suffices for § 1927, but *bad faith* is required for sanctions under the *court's inherent power.*" *Id.* (Emphasis added.)

Lozano Smith appears not to fully recognize the severity of the problems created by its lack of professionalism or still believes that it and Ms. Yama have not "really" breached their professional responsibilities. Lozano Smith argues Ms. Yama's actions were careless or inadvertent, but not in bad faith, because she did *not* knowingly or recklessly raise a frivolous argument or argue for the purpose of harassing her opponent. Doc. 136 at 5:20–23. This

---

**10.** Such actions violate Rule 11. *See Rachel,* 831 F.2d at 1508.

argument is untenable given the substantial evidence that Ms. Yama had ample notice and opportunity to correct the mistakes which were expressly identified by Plaintiff's counsel, yet repeatedly submitted by Defendant's counsel to the Court.

Lozano Smith also reiterates Ms. Yama's specious argument that she relied on the Hearing Officer's characterization of the facts of the case. *Id.* at 5:24–27. Contrary to this assertion, Ms. Yama cited to the administrative record and the hearing transcript, not the hearing officer's decision, to support her misstatements of fact. Their claim is specious that it is the hearing officer's fault. Lozano Smith and Ms. Yama were not entitled to rely on the hearing officer's errors in reciting facts, when the available evidentiary record was to the contrary and should have been their reference source for de novo judicial review.

■■■ Lozano Smith contends that it was entitled to rely upon the Hearing Officer's legal and factual conclusions based on 5 C.C.R. 3085 [11] and, therefore, because the Hearing Officer reached a "legal conclusion" that the accommodations provided under Section 504 of the Rehabilitation Act of 1973 ... fulfilled the District's obligations under the Individuals With Disabilities Education Act, the law firm engaged in no wrongful conduct by arguing that 504 accommodations satisfy IDEA. *See* Doc. 150 at 2:4–7. Lozano Smith's post hoc explanation does not accurately describe the errors included in its Motion for Summary Judgment brief nor does it accurately describe the Hearing Officer's findings.

The Hearing Officer never determined "that the accommodations provided under Section 504 of the Rehabilitation Act of 1973 ... fulfilled the District's obligations under the Individuals With Disabilities Education Act." *See* Doc. 150 at 2:4–7. The Hearing Officer determined the District denied Robert a FAPE, i.e., the District did not fulfill its obligations under IDEA. *See* AR 2243–2253a at 2251. The Hearing Officer went on to say that, despite this denial of a FAPE, "Robert suffered no education prejudice from the District's failure," and Robert was therefore "not entitled to relief in the form of compensatory education." The Hearing Officer concluded (erroneously) that Robert was performing at the college level and was therefore not in need of compensatory education. At no point did the Hearing Officer find that Section 504 accommodation fulfills IDEA requirements—with respect to Robert, or in general.

The offending presentation of law and facts regarding this particular issue begins on page 30 and continues through page 31 of Defendant's Points and Authorities in Support of its Motion for Summary Judgment, Doc. 80. Lozano Smith states, "While the Hearing Officer did determine that there was a 'procedural' denial of a FAPE in Plaintiff's sophomore and junior years ...., substantively, the finding was made that Plaintiff was provided a FAPE based on the accommodations and services provided to Plaintiff under Section 504 of the Rehabilitation Act of 1973." (Emphasis in original). Lozano Smith then states IDEA promises Plaintiff no more than "an educational benefit." *Id.* at 31:10. Under a section headed "The Law" Lozano Smith provides citations regarding the appropriate measure of compensation under IDEA and then continues:

---

11. Lozano Smith incorrectly cited this statute simply as "section 3085 of the California Code of Regulations," requiring a search through the entire Code outline and multiple sub-outlines to eventually find the statute referred to by Lozano Smith. The correct citation is 5 C.C.R. 3085.

In the case at bar, Plaintiff was provided with services that allowed him to graduate from high school in the standard four-year time period. The Hearing Officer, after considering and carefully evaluating all of the evidence, determined that the Plaintiff suffered no educational detriment and was afforded an educational benefit. The IDEA promises him no more.

Recent special education decisions deny a remedy where, despite procedural error, there was no adverse educational impact. South Portland School Dept., 22 IDEL4256 (Me, 2000) . . .

*Procedural flaws do not automatically require a finding of a denial of FAPE. (See, W.G. v. Board of Trustees of Target Range School District, 960 F.2d 1479, 1484 (9th Cir.1992)). In fact, the U.S. Supreme Court defined what is meant by a 'free appropriate public education' and concluded that the IDEA does not require that a student be provided with the best available special education services or that the services maximize each child's potential. It also concluded that the basic floor of opportunity provided by the Act consists of access to education which provides some educational benefit.*

Under Gregory K., the Ninth Circuit upheld the appropriateness of a District's placement if it was reasonably calculated to provide a student with educational benefits. *Gregory K., supra,* at 1314.

Doc. 80, Def.'s Memo re Summary Judgment, at 31:7–23 (emphasis added).

Under the next section headed, "Eligibility," Lozano Smith states:

At the hearing, Defendant did not believe Plaintiff was eligible for special education services under any criteria of IDEA, Plaintiff's disability of CFS was recognized as a disability which actively limited Plaintiff's ability to learn. As such, disability is defined under Section 504 of the Rehabilitation Act of 1973 [citation]. Based on this disability the District believed it provided Plaintiff a FAPE, by implementing appropriate accommodations and services to meet his unique needs, as required by the Rehabilitation Act. [Citation]. Nonetheless, whether Plaintiff was receiving educational assistance pursuant to the IDEA or Section 504 of the Rehabilitation Act, the question remains: was the student receiving an educational benefit from the District which addressed Plaintiff's unique needs? Here, Plaintiff's disability has always been symptoms based upon his chronic fatigue syndrome. His needs are no different under the IDEA or the Rehabilitation Act of 1973. In fact, the FAPE requirement of the Rehabilitation Act is similar to the requirements of the IDEA. The Hearing Officer determined that Plaintiff was eligible under the IDEA and then appropriately examined the evidence to determine whether Plaintiff received an educational benefit or whether he was owed compensatory education services. The facts clearly show, and the Hearing Officer correctly found[,] that [sic] District implemented the necessary accommodations and services, and Plaintiff was provided an educational benefit. Thus, he does not require any additional education.

*Id.* Lozano Smith went beyond mere vigorous advocacy for its client. It intentionally omitted the full citation as discussed infra,[12] which contained law contrary to its

12. "Procedural flaws do not automatically require a finding of a denial of a FAPE. *Howev-* *er, procedural inadequacies that result in the loss of educational opportunity, or seriously*

position and it intentionally argued that 504 accommodations were equal to Compliance under the IDEA.

The Memorandum Opinion and Order in the underlying action, Doc. 102, thoroughly discusses a school district's complete lack of discretion to not comply with the IDEA as opposed to substituting alleged performance under Section 504 of the Rehabilitation Act. *See* Doc. 102 at 159–160. This is more than coincidence—legal interpretations hold section 504 simply cannot replace IDEA: "Both section 504 and IDEA have been interpreted as requiring states to provide a free appropriate public education to qualified handicapped persons, but only IDEA requires development of an IEP and specifically provides for transition services to assist students [to] prepare for a post high school environment. *See* 20 U.S.C. § 1401(a)(2). Under the statutory scheme, the school district is not free to choose which statute it prefers." *Id.* at 1376. *See also Muller v. Committee on Special Education of the East Islip Union Free Sch. Dist.*, 145 F.3d 95, 105 (2d Cir.1998) (once a student is entitled to benefits under IDEA, the district "should have devised an IEP to meet [the student's] unique needs in compliance with the provisions of IDEA, and its proposed plan under Section 504 of the Rehabilitation Act was not an adequate substitute.").

It is difficult to comprehend what part of "no choice" Lozano Smith does not understand when it states there is a "dearth of

definitive guidance from the courts as to whether Section 504 accommodations could under any circumstances provide FAPE in lieu of services written into an IEP, particularly in the Ninth Circuit." [13] Doc. 150 at 3. While Lozano Smith claims justified deference to the Hearing Officer's decision on the issue, the section of its brief subject to sanctions does not quote an explicit misstatement of law by the Hearing Officer that Lozano Smith repeats; Lozano Smith independently mischaracterizes the law, including an intentional exclusion of applicable case law stating the opposite principle. Lozano Smith intentionally asserted 504 accommodations are legally *equivalent to* compliance under the IDEA, despite clear law to the contrary. Lozano Smith's argument that Ms. Yama's and its own actions are not bad faith evidences a failure to understand or acknowledge the history of this case and to refuse to accept responsibility for what occurred.

Lozano Smith had actual notice as early as 2001 that there were issues regarding its potential wrongdoing in this case. On November 8 and November 26, 2001, Plaintiff's attorney notified Lozano Smith attorneys Edward Sklar, Elaine Yama and Michael Smith, of their multiple transgressions with respect to misciting the administrative record. *See* Graves Decl. Regarding Evidence, Doc. 151, Exh. D and E. Plaintiff twice explicitly requested that Lozano Smith correct its misstatements to the court and at least one time Plaintiff threatened to submit a motion for sanctions on the issue.[14] *Id.* Yet Lozano Smith

---

*infringe the parents' opportunity to participate in the IEP formulation process clearly result in the denial of a FAPE." W.G. v. Board of Trustees of Target Range School Dist. No. 23, 960 F.2d 1479, 1484 (9th Cir.1992) (emphasis added).*

**13.** The cases cited above are not from the Ninth Circuit, however, they provide explicit guidance on the issue and cannot be inter-

preted to mean anything other than what they say. Lozano Smith's "no guidance" argument is specious and provides no basis for misstating the law or mischaracterizing the facts.

**14.** Plaintiff's warnings were directed to Defendant's Trial De Novo briefs—apparently submitted by Mr. Sklar.

took absolutely no action in response and continued to misrepresent the record in its later Summary Judgment briefs.

Many of the misstatements of law and fact are incorporated in both sets of Defendant's briefs—and the first set was apparently not written by Ms. Yama. At least one of the documents (cited above for misstating facts and law) was personally signed by Michael Smith, a founding shareholder of Lozano Smith. *See* Doc. 87, Def.'s Opposition re Summary Judgment at 30. Mr. Smith's statement that he simply "glanced at the document," made editorial changes and signed it violates Rule 11. The rule is designed to "eliminate the defense of personal ignorance of defects in a paper challenged as unmeritorious." *See Zaldivar,* 780 F.2d at 830 ("The Rule admits of no exceptions to the requirement that all reasonable attorneys will read a document before filing it in court.").

More importantly, the problems with counsel's conduct were referenced by Plaintiff in his filings throughout the course of the case, yet Lozano Smith made no investigation or attempt whatsoever to correct the problems, despite Plaintiff's direct requests that it do so. When Lozano Smith faxed to the District a copy of Ms. Grave's November 8, 2001, letter threatening sanctions if the firm did not correct its misrepresentations to the court, Mr. Sklar of Lozano Smith, stated to the District, "Received from Maureen Graves. Nothing really to respond to, but call me if any questions." *See* attachments to Doc. # 150.

It is incomprehensible that none of the three defense attorneys of record paid any attention to Plaintiff's letters accusing Lozano Smith and its client of misconduct and threatening a sanctions motion. It is equally incomprehensible that: 1) Mr. Sklar felt there was "nothing to respond to" in Plaintiff's letter threatening a sanctions motion for Lozano Smith's abusive practices; and 2) that the same misstatements made in the Trial De Novo briefs were repeated in the Summary Judgment briefs despite Plaintiff's detailed complaints.

Lozano Smith's and Ms. Yama's culpability is aggravated by the fact that their one and only response to Plaintiff's accusations of misconduct came in their Reply Brief where they assert that they have been "nothing but honest and candid with the court." Doc. 91 at 1:20–23. Lozano Smith and Ms. Yama reviewed the Plaintiff's accusations and dismissed them. Such conduct is inconsistent with their proclaimed sincerity, characterizing the misstatements made in the briefs as "mistakes" or due to a "misunderstanding" or "confusion" surrounding the procedures and the large administrative record.

Lozano Smith is a purported expert in this area of law; it knows the laws, knew its client had no legitimate legal basis for its position, and apparently believed the Court would accept their misrepresentations and rubber stamp the Hearing Officer's erroneous decision.

Ignorance is no defense. *Zaldivar,* 780 F.2d at 830. Lozano Smith's malfeasance was clearly and repeatedly drawn to their attention by Plaintiff. Yet Lozano Smith deliberately ignored the notice it received, assuming the Court would be too busy or too indifferent to take the time necessary to find the truth.

Based on the totality of the circumstances, there is no way to interpret Lozano Smith's submissions of multiple misleading pleadings under the signature of no less than three attorneys as anything other than a bad faith attempt to mislead the Court about the facts and the law to gain the advantage of prevailing without

regard to the true facts and accurate statements of the law. Given Lozano Smith's steadfast refusal to address *any* of Plaintiff's repeated complaints about its malfeasance (other than to flatly deny it in one Summary Judgment brief, *see* Doc. 91 at 1), no other conclusion can be drawn but that its actions were in bad faith to harass the Plaintiff and to obstruct the ascertainment of truth in this case. That Lozano Smith is an expert in this area of law only compounds the severity of its violations. *See Worrell v. Uniforms To You & Co.,* 673 F.Supp. 1461, 1465 (N.D.Cal.1987) ("That counsel with extensive experience in the area of labor and employment law could assert such an erroneous view of the law regarding Title VII raises a strong inference that there was an improper purpose behind the pleadings."). Lozano Smith assigned Jerome Behrens, Esq., a respected and competent member of their firm to address the Order to Show Cause proceedings. Mr. Behrens had no knowledge of or participation in any of the conduct nor did he have any responsibility for the firm's handling of the case. This, however, does not excuse the firm's ethical obligations.

Lozano Smith's actions are sanctionable under Rule 11(b)(1), (3) and (4) for submitting pleadings asserting meritless objections and false statements of facts. Lozano Smith's actions are also sanctionable under 28 U.S.C. § 1927 and the Court's inherent power, for bad faith attempts to mislead the Court, and to obstruct and multiply the proceedings, and to harass the Plaintiff.[15]

Lozano Smith is being sanctioned under Rule 11 for the frivolous objections, misstatements of fact and law contained in its Trial De Novo and Summary Judgment pleadings. Lozano Smith is being sanctioned under 28 U.S.C. § 1927 and the Court's inherent power, for its bad faith steadfast refusal to correct these errors when faced with repeated, explicit notices that it was conducting itself unethically, in violation of its duty of truth and candor to the Court, and its efforts to harass the Plaintiff.

### E. *Defendant, Bret Harte Unified School District*

■ Defendant Bret Harte Unified School District chose not to submit its own briefs regarding the Order to Show Cause, or to separately appear, despite it being named in the Order to Show Cause.[16] Defendant did, however, answer fifteen interrogatories authorized by the Court and propounded by Plaintiff, which document the District's significant involvement in this case and actual knowledge of and receipt of notice during the proceedings, of its attorneys' misconduct.[17]

In answer to Interrogatories 3 and 13, Defendant admits it received Ms. Graves' November 8, 2001, letter, the first of the two by Plaintiff calling upon Defendant to stop misstating the record *and* to correct its misstatements with the Court. This letter threatens a motion for sanctions absent corrective action by Lozano Smith. *See* Graves Declaration Regarding Evi-

---

**15.** At a minimum, Lozano Smith's actions amount to sanctionable recklessness and knowing conduct in that it ignored repeated warnings it was misrepresenting the facts and in fact is was misrepresenting the facts.

**16.** The court raised the issue of conflict between the District and its attorneys in the OSC matters.

**17.** The answers to these interrogatories were submitted by Plaintiff's counsel. *See* Graves Decl. regarding evidence, Doc. 151, Exhibit G.

dence, Doc. 151, Exh. G at 6 and 19. However, in direct contradiction to its answer to Interrogatory Number 8, the District states:

I did not receive a copy of the correspondence dated November 8, 2001, from Plaintiff's counsel, Ms. Maureen Graves, and I was not provided that document by Lozano Smith. Since I did not receive a copy of the correspondence from Plaintiff's counsel dated November 8, 2001, I did not respond to any of the allegations of misrepresentation of fact and law contained therein.

*Id.* at 13. Lozano Smith has submitted fax transmission confirmation sheets showing that it faxed and Defendant did indeed receive this letter. *See* attachments to Doc. 150.

In answer to Interrogatory Number 5, the District admits it read the Trial De Novo Briefs submitted on its behalf as well as Plaintiff's reply brief (which contains numerous complaints about Defendant's misrepresentations). *See* Graves Decl. Regarding Evidence, Doc. 151, Exh. G at 10–11. In answer to Interrogatory Number 6, Defendant admits it read the brief but claims it did so after the brief was submitted to the Court, and therefore, the District "did not attempt to correct any misstatements of fact or misleading representations on factual matters." *Id.*, Exh. G at 12–13. Defendant's statement that because the briefs were already submitted to the Court it made no effort to correct any misstatements contained in the briefs, is an abdication of the duty of candor any party owes the court. In-house counsel reviewed the briefs and, as an attorney licensed to practice law in California, is under the same ethical responsibilities as Defendant's outside counsel to see that only truthful and accurate information is submitted to the Court.

 The District, as a party, has a duty to be honest and to correct any factual errors, to notify its attorneys to enable them to file corrections or amended papers and to ensure the same mistakes were not repeated in future pleadings. Rule 11 applies to parties as well as their counsel. *See Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1508 (9th Cir.1987).

In answer to Interrogatory Number 9, the District admits it was provided a copy of Plaintiff's November 26, 2001, letter and addresses its discussion of the settlement issues contained in this letter.[18] However, the District ignores that portion of the Interrogatory that inquires, "Please describe, in detail, the District's review of and response to the settlement correspondence dated November 26, 2001, *and the allegations regarding misrepresentations of fact and law contained therein.*" Graves Decl. Regarding Evidence, Doc. 151, Exh. G at 13–14 (emphasis added). The District provides no response regarding what steps it took to correct the misstatements of fact contained in its pleadings after a second notification from Plaintiff on November 26, 2001. From Defendant's evasive answer it is inferred that the District purposefully took no steps to correct any misstatements it found in the first round of briefs and intentionally let its counsel continue to repeat those misstatements in the later Motion for Summary Judgment briefs.

The District took a hard line position, despite its obvious and knowing violations of IDEA, and chose to wait until after Summary Judgment was granted against it before it settled with Plaintiff. The

---

**18.** The District also acknowledges receipt of this letter in answer to Interrogatory Number

11. *See id.*

District was entitled to a hearing on summary judgment and is not being sanctioned for asserting its position on the merits of plaintiff's claims.

The District had an obligation to correct the many factual misstatements contained throughout its papers, *especially* since it was given notice by plaintiff regarding allegations of misconduct and because it had its own in-house attorney review these briefs and Plaintiff's letters. By not correcting the errors contained in the initial Trial De Novo briefs, despite notice of such errors, the District joined the bad faith perpetration of those falsehoods in the subsequent briefs submitted to the Court. "Bad faith" exists, not only in the actions that led to the lawsuit, but also in the conduct of the litigants. *Roadway Express,* 447 U.S. at 766, 100 S.Ct. 2455.

The only reasonable conclusion is that the District intentionally chose to ignore the warnings it received that it was misrepresenting the truth to the Court, in an effort to mislead the Court and to prolong the proceedings in the hope that Plaintiff would give up. The District's conduct rises to bad faith. The power to sanction the District exists under Rule 11, § 1927, and the Court's inherent authority. *See Roadway Express,* 447 U.S. at 766, 100 S.Ct. 2455.

The District should be sanctioned under the Court's inherent powers for its bad faith efforts to deceive the court by not addressing and correcting the obvious misstatements of fact contained in its Trial De Novo briefs and by allowing these errors, and others specified above, to be perpetuated in their Summary Judgment briefs. This conduct was obstructive and manifestly multiplied the proceedings.

### F. *Nature of Sanctions*

Lozano Smith has submitted declarations that it recognizes the seriousness of its conduct in this case and has or will conduct attorney training in ethics and that Ms. Yama has been disciplined by the firm due to her misconduct. These "voluntary" actions are appropriate and recognized as a good faith effort to address the harm perpetrated on the system of justice. These remedial actions are inadequate to redress the totality of the harm visited upon the plaintiff and the legal system. Lozano Smith, Ms. Yama and the District all engaged in egregious conduct, whether by commission or omission. Their "solution" does not recompense Plaintiff for his increased litigation costs caused by their malfeasance,[19] or the unjustified burden on the Court, nor provide the necessary deterrent effect.

The actions of Lozano Smith *significantly* increased the Court's work on the case, both in the effort required to identify and verify the numerous misstatements in the pleadings in order to resolve the underlying issues on the merits, but separately to address the ethical violations in the Order to Show Cause proceedings and this decision.

The submissions of Ms. Yama, Lozano Smith and the District belie true comprehension of the seriousness of their transgressions against Plaintiff, the Court and the justice system. The District evinced no interest in these proceedings and was intentionally unwilling to truthfully or completely answer the Interrogatories propounded by Plaintiff under Court order. The evasive and contradictory answers by the District indicate a complete lack of respect for the judicial process. In re-

---

19. It is acknowledged that Lozano Smith offered Plaintiff's attorney $15,000 for attorney's fees to cover these costs and that Plaintiff deferred to the Court the resolution of any monetary sanctions.

spect to these Order to Show Cause proceedings, the District, which was severally noticed as a respondent, did not even send its own independent representative or separately address the Court's questions about the improper conduct that was used on its behalf in an attempt to gain advantage over the Plaintiff. The District was represented by its own attorney in the underlying case, independent of Lozano Smith, which is more disturbing. The District reviewed and sought to benefit from its litigation counsel's misconduct, and has ignored its responsibility to respond in this proceeding. Despite noting the appearance of conflict between Lozano, Smith, Ms. Yama, and the District in this proceeding, the District remained silent. The District must be independently sanctioned.

## V. CONCLUSION

The totality of the sanctioned conduct visits an unendurable burden on the justice system in the name of misguided advocacy. It is appropriate that a public record be made of this conduct for the purpose of deterrence, particularly as it implicates unacceptable written advocacy and obstruction which violates rules of court and professional conduct, forcing an opposing party and the court to spend inordinate time addressing such issues.

For the reasons above stated, IT IS ORDERED:

1. Ms. Elaine Yama, Lozano Smith and Bret Harte Unified School District, as a party, engaged in bad faith litigation tactics through their systematic and repeated misstatements of the record, frivolous objections to Plaintiff's statement of facts, and repeated mischaracterizations of the law.

■ 2. Under FRCP Rule 11, 28 U.S.C. § 1927, and the Court's inherent powers, Ms. Yama is ordered to personally pay Plaintiff and his counsel $5,000 for the increased costs and expenses related to causing Plaintiff's need to repeatedly respond to Defendant's blatant misrepresentations, throughout the four year history of this litigation; Ms. Yama is PUBLICALLY REPROVED and ordered to attend 20 hours of CLE ethics training in programs approved by the California State Bar Association by December 31, 2005, and must submit proof of such training to the Court by December 31, 2005; training received by Ms. Yama while this decision was pending will count towards this requirement. Proof of training must be submitted when the training is complete, not piecemeal.

■ 3. Under Rule 11, 28 U.S.C. § 1927, and its inherent powers, Lozano Smith is ordered to pay Plaintiff and his counsel $5,000 for the increased costs and expenses related to Plaintiff's need to repeatedly respond to Ms. Yama's misrepresentations, and briefs on which partners of the firm were appearing counsel, throughout the four year history of this litigation. Lozano Smith is PUBLICALLY REPROVED. Lozano Smith is further ordered to provide a minimum of 6 hours of CLE ethics training for all its associates and shareholders, in programs approved by the California State Bar Association, by December 31, 2005, and must submit proof of such training to the Court by January 30, 2006; training received while this opinion was pending will count towards this requirement. Proof of training must be submitted when the training is completed, and not piecemeal.

■ 4. Under Rule 11 and the Court's inherent power, Bret Harte Unified School District, a party, is ordered to pay to plaintiff Robert Moser the sum of $5,000 for his expense, inconvenience, and delay for its role in obstruction, delay in relief, and unnecessarily multiplying the proceedings in this case.

The payment of such sanctions shall be made within forty (40) days following the date of service of this decision by the clerk of court.

A copy of this decision shall be served on the California State Bar Association by the Clerk of Court.

SO ORDERED.